**COMMONWEALTH OF PENNSYLVANIA et al., Plaintiffs,**

v.

**Joseph F. O'NEILL et al., Defendants.**

**Civ. A. No. 70–3500.**

United States District Court,
E. D. Pennsylvania.

July 7, 1972.

On Motion for Modification
Sept. 22, 1972.

On Motion for Stay Sept. 25, 1972.

Memorandum Sept. 29, 1972.

Memorandum on Answers to Inquiries
Sept. 30, 1972.

F. John Hagele, Robert P. Vogel, Robert Reinstein, Henry W. Sawyer, III, Amy F. Davis, Philadelphia, Pa., for plaintiffs.

John M. McNally, Jr., Murray C. Goldman, James M. Penny, Jr., Philadelphia, Pa., for defendants.

A. Charles Peruto, Philadelphia, Pa., for Fraternal Order of Police, intervenor.

## FINDINGS OF FACT

FULLAM, District Judge.

### I. *Background*

The Commonwealth of Pennsylvania and several black citizens of Philadelphia, representing a class of black police officers and unsuccessful applicants for positions in the Philadelphia Police Department, brought this action against the City and certain of its officials, alleging that the Police Department's hiring and promotion practices discriminate unconstitutionally against blacks. The action was commenced in December 1970. After extensive discovery, requiring several applications to the Court, the plaintiffs moved in April 1972 for preliminary relief.

Five and one-half days of hearing were held, at the conclusion of which, on May 26, 1972, I entered an interim order temporarily restraining the defendants from hiring any policemen except as required to fill vacancies which existed on March 1, 1972. In hiring to fill such vacancies, the defendants were required to hire at least one black applicant for every two white applicants. 345 F.Supp. 305. Defendants have appealed from this order, and in the interim have de-

cided not to conduct any hiring. On June 8, the Court of Appeals denied defendants' application for a stay of the order; the appeal is still pending. The May 26 order did not affect promotions, partially in reliance upon the representation of counsel for defendants that only 14 promotions were contemplated. During the week of June 12, defendants promoted 56 policemen. Plaintiffs moved for an injunction against further promotions pending a decision on the motion for preliminary injunction, and for an order requiring defendants to rescind all 56 promotions except those which complied with the one black to two white standard previously set forth for hiring. On June 15, I denied plaintiffs' motion, except to the extent of enjoining further promotions beyond the additional 16 which were then represented by counsel for defendants to be contemplated and deemed necessary. The principal reason for this result was that, by happenstance, all promotions and proposed promotions after the initial group of 30 (*i. e.*, the additional 26 already promoted and the 16 proposed) included nearly one-third blacks.

Applicants for positions in the Police Department must undergo a four-step elimination procedure, consisting of a written examination, a physical and psychiatric examination, and a background investigation and evaluation. Plaintiffs challenge the first and last steps, contending that (a) the written examination eliminates a disproportionate number of blacks and has not been shown to be a valid predictor of performance as a policeman, and (b) the background investigation has a similar discriminatory effect, as a result of the selection of negative factors which are deemed disqualifying, and of the discriminatory application of these factors. With respect to promotions, a three-factor rating (written examination, seniority, supervisor's performance rating) is employed in selecting among applicants for promotion up to lieutenant; for higher ranks, those three factors are combined with an oral examination. Plaintiffs allege that the written examination operates discriminatorily, and does not predict subsequent job performance.

## II. *Hiring—Overall Statistics*

The percentage of persons hired as police officers who are black has declined from 1966 to 1970 as follows:

| YEAR | PERCENTAGE BLACK |
|------|------------------|
| 1966 | 27.5% |
| 1967 | 25.3 |
| 1968 | 15.3 |
| 1969 | 11.2 |
| 1970 | 7.7 |

The result has been a decline in the proportion of police officers who are black.

| YEAR | PERCENTAGE BLACK |
|------|------------------|
| 1967 | 20.8% |
| 1968 | 20.7 |
| 1969 | 20.1 |
| 1970 | 18.6 |
| 1971 | 18.0 |

Defendants submitted evidence demonstrating that the proportion of blacks in the Philadelphia Police Department compares favorably with those in many other cities. Plaintiffs submitted evidence demonstrating that this proportion compares unfavorably with those in other city agencies in Philadelphia, and that, notwithstanding a substantial increase in the size of the police force, the actual number of black policemen has been declining in recent years.

## III. *Hiring—Written Examination*

### A. *Discriminatory Effect*

Comparison of the passing rates of blacks and whites is the most effective means of determining whether the written examination disqualifies a disproportionate number of black applicants. However, there is no official record from which to derive the statistics necessary to construct such a comparison, and the parties are unable to agree on the figures. Accordingly, plaintiffs submitted evidence from which initial statistical findings could be made.

1. *Approximately 35% of all persons who take the written examination for positions in the Police Department are black.*

The City of Philadelphia is forbidden by state law to maintain records of the race of applicants who take the written examination. Plaintiffs therefore made several studies on which to base an estimate of the actual racial percentages among applicants; all of these studies indicate that approximately 35% to 40% of the applicants are black.

One, a study made by William Powe, a graduate student at the University of Pennsylvania, ascertained that 38% of applicants were black. Because Mr. Powe did not himself make the determinations of race, and because the individual who did, presumably, relying on his purported expertise, did not testify, I cannot give any independent weight to this figure; however, since it is close to the other approximations presented by plaintiffs, it tends to corroborate their accuracy.

In the course of his study, Mr. Powe interviewed Richard Garlatti, Director of Recruiting for the City of Philadelphia, who advised him that the City "does not have a problem in recruiting blacks to take the police test." (N.T. 36.) Mr. Garlatti also testified to his "guesstimate" that 40% of all applicants are black. (N.T. 202.)

Finally, Dr. Bernard R. Siskin, Assistant Professor of Statistics at Temple University and one of plaintiffs' experts, conducted a study in which he matched the addresses of a random sample of one-fourth of all applicants in 1969 and 1970 with the appropriate census block. Assuming that the likelihood that a particular applicant was black corresponded to the proportion of blacks in the census block (utilizing 1970 figures), Dr. Siskin concluded that 34.7% of all applicants were black. Defendants challenge the accuracy of the assumption underlying the use of the technique, arguing that blacks do not necessarily apply to become policemen in the same proportions as their number in the population, and Dr. Siskin admitted that the "nonstatistical bias" could detract from the accuracy of his result. (N.T. 245.) But the defendants have made no effort to demonstrate that the census-block approach cannot validly be applied. If this contention were true, a survey of a sample of Dr. Siskin's sample for which race is known or ascertainable might demonstrate the invalidity of his method. One of defendants' experts, Dr. Erwin Taylor, testified:

"I would say that in the so-called black ghetto where you would find very few whites, the likelihood of black applicants would be much lower than their representation in the population. I would say in some middle-class mixed neighborhoods it might be higher." (N.T. 539.)

This contention (unsupported by evidence) tends to support the use of a census-block technique. In the ghettos, where black populations may approach 100%, use of this method almost surely provides accurate results: if a block is 100% black, any applicant from the block will be black. In the integrated blocks, where there is more room for error, Dr. Taylor's statement, if true, allows the plaintiffs to place somewhat greater confidence than otherwise possible in the assumption that blacks apply in proportion to their proportions in the population of a block. Moreover, other statistics in evidence tend to support the accuracy of 34.7% as a rough figure, perhaps even conservative in its estimate of black percentage. In 1969 and 1970, 2,027 whites and 586 blacks underwent background investigations; 22.4% of the total was black.[1] (P-4, p. A-2.)

---

1. A more rigorous analysis would adjust for the fact that some of those who took the written examination in 1970 were not investigated until 1971, and that some of those investigated in 1969 took the written examination in 1968. Since the percentage reaching the background stage who are black has been declining, strict accuracy would detract somewhat from the conclusion Dr. Siskin may have been

Assuming that equal percentages of blacks and whites failed the intervening physical and psychiatric examinations, or dropped out before the background stage,[2] 22.4% of those who passed the written exam were black. Assuming for the moment the accuracy of the estimate that 34.7% of the written test applicants were black, the passing rate among blacks is seen to be approximately 20.5%, rather than the 16.5% that Dr. Siskin estimated.[3] Therefore, it is likely that Dr. Siskin's technique tended to undercount the blacks in the population studied; at minimum, allowing for statistical error, the foregoing supports Dr. Siskin's figure as reasonable.[4]

Finally, and very significantly, defendants have disclosed no attempt to develop their own estimate, despite adequate opportunity to do so. Dr. Taylor testified to his "best estimate" that 20% to 25% of all applicants were black, but on examination it was apparent that he was engaging in speculation. (N.T. 623–24.) His recognition that the proportion of blacks passing the written examination would be equal to the proportion of whites passing if 22.6% of applicants were black (D–8, p. 18) suggests that the determination of his "best estimate" may have been motivated by other than purely factual considerations.

2. *The percentage of whites who pass the written examination is approximately 1.82 times as great as the percentage of blacks who pass.*

As demonstrated earlier, it is possible to ascertain from the statistics developed in connection with the background reports the approximate ratio of white passing percentage to black passing percentage. Assuming that the percentage of applicants who are black is 34.7%, the ratio is approximately 1.82 to 1.[5]

conservative, but not from the conclusion that 34.7% is an acceptable ballpark figure.

2. In fact, the percentage of black failures or dropouts at this stage may be slightly

lower than that for whites. (N.T. 42, 139–40.) If so, this fact detracts somewhat from the accuracy of the figures used in this analysis but not so much as to destroy its validity as a means of corroborating Dr. Siskin's 34.7% figure.

3. 1. $$22.4 = \frac{34.7\% \times \text{black pass rate}}{(34.7\% \times \text{black pass rate}) + (65.3\% \times \text{white pass rate})}$$

$$\frac{\text{white pass rate}}{\text{black pass rate}} = 1.85$$

2. $(.347 \times .165) + (.653 \times .40) = .318$
Total pass rate $= .318$

3. $\times =$ black pass rate
$.347 \times + .653\ (1.85 \times) = .318$
$\times = .205$

4. This point may be made more clearly if simple numbers are used. Suppose 800 took the test and 130 passed. An analyst identifies 300 of the applicants as black and 500 as white; 30 of the passers as black and 100 as white. However, it subsequently appears that rather than the 10% pass rate shown, the blacks passed at a rate of 12½%. Assuming that errors in identification did not occur more or less frequently among passers than among non-passers, the analyst has undercounted both black passers and test-takers in equal proportions. If in fact 20% of

those whom he identified as white were blacks, the revised totals are 400 black and 400 white applicants; 50 black and 80 white passers.

5. For 1968 to 1970, 2,436 whites reached the background stage and 710 blacks P–4, p. A–2). Assuming that the same proportions of black as whites failed the intermediate stages, 22.6% of those who passed the written test were black. (If in fact a higher proportion of blacks pass the intermediate tests, as may be the case —see Note 2, *supra*—fewer than 22.6%

The far lower, and probably too conservative estimate of 30% would provide a ratio of 1.46 to 1.

## B. *Validity of Examination*

Plaintiffs' testing expert, Dr. Richard S. Barrett, testified to his opinion that the written examination has not been devised in a professionally acceptable manner or in a manner consistent with guidelines promulgated by the Equal Employment Opportunities Commission; that the result is a poorly-constructed test which discriminates unfairly against blacks and which may not adequately predict job performance; and that it would be possible to fashion an appropriate examination. Defendants' evidence was to the effect that the examination is a valid predictor of performance at the Police Academy for blacks and whites; that performance on the job cannot be predicted; and that mere inspection of a test is insufficient to permit an evaluation of its appropriateness.

### 3. *The written examination has not been demonstrated to be job-related.*

Defendants' experts, Drs. Joseph Mamelak and James W. Gaither, presented a report (D–13) demonstrating a statistically significant correlation between entrance examination grades, on one hand, and Police Academy final written examination grades and final Academy average, on the other. Dr. Taylor made a similar analysis, including also correlations between entrance score and grade on the three particular Academy courses for which grades are available (firing range, driver instruction, first-aid) and correlations by race. Almost all correlations developed were highly significant. On the basis of these studies, defendants contend that the entrance examination has been shown to be a valid predictor of performance.

For several reasons, I cannot accept this conclusion. Assuming the accuracy of defendants' study, there has been no showing of any correlation between success at the Police Academy and effective performance on the job. Defendants contend that it is appropriate to develop entrance examinations to predict performance in a training program, but absent evidence of the program's success in achieving its objectives, evidence of the examination's competence to predict ability to complete training is of little assistance in determining whether the examination is sufficiently job-related to permit its use despite its discriminatory effect.[6] Moreover, unless there is perfect correlation between Academy grades and on-the-job performance, a virtual impossibility, an examination which predicts the latter would be preferable to one which predicts success in training. Defendants' experts, Drs. Mamelak (N.T. 698–99) and Gaither (N.T. 782–85) assert that it would be impossible to develop a predictor of on-the-job performance, primarily because a policeman's functions are extremely varied and it might be difficult to define success. Dr. Mamelak has little or no expertise in the area of testing, however (his description of work done in the testing field, N.T. 669, indicates that his function has been as mathematician), and Dr. Gaither has none in the area of employment examinations. Dr. Taylor, who does have such expertise, agreed with the Mamelak-Gaither opinions (N.

---

of the passing would have been black, and the ratio of white passing percentage to black would be greater than 1.82.)

Pb = pass rate for blacks
Pw = pass rate for whites

$$\frac{.347\ Pb}{.347\ Pb + .653\ Pw} = .226$$

$$\frac{Pw}{Pb} = 1.82$$

6. Defendants seek to have the Court attribute more significance to Academy performance than they themselves give. Initial job assignments are made without regard to performance at the Academy. P–20.

T. 555), without stating reasons. It appears that this conclusion is based on a misapprehension as to the state of the art. Dr. Barrett's testimony to the effect that creation of a valid job-related examination is possible (N.T. 329–30; 853–58) seems to be based upon an appreciation that a policeman's job is a complex one, but also on a belief that other positions for which valid tests have been developed are no less complex. The existence of validation studies in Detroit and Chicago indicates that the job is not so hopeless that experts are not willing to attempt to create a valid police examination, although the examinations that have been developed have not been put into effect. Since the City has apparently never attempted to develop a test to predict performance on the job, its assertion that any attempts would be futile is premature.

Moreover, the correlation made by Drs. Mamelak and Gaither may be misleading. There is no evidence as to the type of examination administered at the Academy. If in fact tests of the type contained on the entrance examination were used, a high correlation could be anticipated even if an individual had not mastered the training material.

Finally, the Mamelak-Gaither study did not, and of course could not, consider the effect that the designation of a passing grade for the entrance examination could have had (N.T. 739). It is possible that candidates with lower scores could have successfully completed the training. That no recruit has been dismissed from the Academy in the past five years for academic reasons (P–19) suggests that a lower passing grade might well have been appropriate. Dr. Taylor testified (N.T. 547) that in theory, the passing grade should be determined by means of a validity analysis, but he believed that it would be impractical, because "it would mean admitting . . . into the academy three or four or five or ten times the number of people that we plan to graduate and letting them go through . . . then throwing out say 90% of them. . . ."

(because a validation study requires acceptance of a large number of applicants, including some who might not otherwise be accepted, and correlation of their examination results with subsequent job performance). The assumption that 90% would fail out of the Academy assumes the conclusion that a lower passing rate would be inappropriate. Moreover, it would not necessarily be appropriate or mandatory to admit into the Police Academy all persons who take the written examination (and who are not otherwise disqualified) in order to ascertain a valid passing grade. It is very likely that some of the present members of the Police Department failed the test before ultimately passing it; their job performance would be informative. Additionally, testing experts can reach judgments as to whether some applicants may be so obviously unqualified on the basis of their performance on the examination that their acceptance on the police force would not assist in the validation of a passing grade and/or would constitute an unacceptable risk. It should be remembered that the passing grade that must be validated is a score on an examination developed by testing experts and therefore more likely to be valid, according to Dr. Barrett's testimony, than the present test; a refusal to give further consideration to applicants who score below a given low grade on such a test, which is likely to be found valid, would therefore be justifiable.

In view of the finding that the examination has not been validated as job-related, it is unnecessary to consider plaintiffs' assertion (which is, of course, bound up with the contention that the test is not job-related) that the test is a poor one in that it is too difficult, it rewards test-taking ability, and it examines applicants in inappropriate subject-matters. If the examination were proved to be job-related, these contentions might be relevant if it were thought appropriate to require defendants to devise the least discriminatory test possible. *See* Chance v. Board of

Examiners, 458 F.2d 1167, 1177, 1178 (2d Cir., 1972) (unnecessary to decide whether least discriminatory means standard is appropriate); Castro v. Beecher, 459 F.2d 725, 733 (1st Cir., 1972) (least discriminatory means standard inappropriate). Nor is it necessary to consider at this point plaintiffs' contention that defendants have not employed the proper means to create a valid entrance examination.

## IV. *Hiring—Background Investigation*

### A. *Accuracy of Plaintiffs' Data*

4. *Plaintiffs' statistical evidence with respect to the background investigations is substantially accurate, and sufficiently probative to warrant its use at this preliminary stage of these proceedings.*

The data submitted by plaintiffs in support of their contentions that the background investigation process is discriminatory is based in large measure on a study of the police files which contain the investigative reports of all applicants accepted and rejected in 1968, 1969 and 1970. Based upon their review of the background files of the individual plaintiffs, Dr. Bernard R. Siskin, plaintiffs' statistical expert, and Prof. Robert Reinstein, one of plaintiffs' attorneys, compiled a list of 25 factors, representing every category of derogatory information which appeared in the files and any others thought likely to appear. A form incorporating this list and including a category "other" was developed (P–2); it will be referred to as the coding sheet.

Dr. Siskin chose Mr. and Mrs. Ralph Kates, a law student and a graduate student in communications, respectively, to supervise a team of students who were to examine the police files, locate all items of derogatory information, and report their findings on the coding sheet by making a notation opposite the appropriate category. The coders were selected by Prof. Reinstein from the Temple Law School student body, and by Mr. and Mrs. Kates from among people they knew personally and people who responded to a notice placed on a University of Pennsylvania bulletin board. Some of the students were volunteers; others were paid. Mr. and Mrs. Kates instructed their workers in the meaning of the categories on the coding sheet; the sources of information within the background files; the code which was employed to transcribe information from the files to the sheet. Each coder's entire work product was checked by Mr. or Mrs. Kates until the coder had turned in one full day of error-free work. After that, a random sample consisting of approximately ten percent of each coder's work was inspected; if any inaccuracies were spotted in any category, each of that coder's files was checked for errors in that category. In order to insure uniformity, Mr. and Mrs. Kates communicated daily with Dr. Siskin to classify individual bits of information which did not fall clearly within one of the coding sheet's categories.

Defendants challenge the accuracy of the statistics which were developed from the information contained on the coding sheets. Several objections are made.

a. *The coders were biased.*

Defendants contend that the coders could not be objective, because they were aware of the purpose of this action, and knew that a judgment for plaintiffs must be based upon a finding of discrimination. Particularly is this asserted to be so in the case of the volunteer coders. I find defendants' assertions are without merit. The coders were informed of the need for accuracy (N.T. 126, 273); it should have been apparent to them that any errors could have been easily spotted by the defendants (who were given copies of the completed coding sheets (N.T. 823–24)), and that any pattern of errors would detract from the credibility of the study and from the plaintiffs' likelihood of success. Additionally, 70 to 80 percent of the coding sheets and their respective files were checked by Mr. or Mrs. Kates (N.T. 976). Mr. Kates testified and left no doubt as to his concern for the accuracy of the proj-

ect. There is no reason to suppose that his wife, whose credentials are excellent (N.T. 941) was any less conscientious. Finally, defendants, who have access to the completed coding sheets, have not come forward with any examples of errors. Any significant bias, if reflected in the coders' work, would be apparent on a comparison of files with coding sheets.

### b. *Some coders were more lenient than others.*

Defendants contend that even if the coders were not biased, they did not all employ the same standards in determining whether an item in the background file should be recorded on the coding sheet. In support of this assertion, Dr. Taylor testified, for example, that the coder designated as number 1 found an average of 2.68 negative factors in accepted blacks, but coder number 2 found 4.58 (N.T. 488–91). However, these statistics are meaningless without evidence that the files examined by the two coders to be compared were comparable. The Police Department provided the coders with files in boxes of fifty to one hundred each, each box containing files of either accepted or rejected applicants, not both, and usually containing files from one year only (N. T. 959). Thus, it is virtually certain that there is no valid basis for comparison between coders. Moreover, Dr. Taylor's figures (D–8, p. 1) show that the average number of negative factors for accepted blacks increased between 1968 and 1970 by 46%; the discrepancy between the coders' reports may simply reflect this trend. Again, defendants presented no specific evidence that coders treated factors differently.

### c. *The categories chosen for the coding sheet were ambiguous and lent themselves to subjective determinations.*

Defendants contend that the coders might have had to exercise judgment in determining the proper category for a particular negative item, or in determining the appropriateness of inclusion of an item on the coding sheet. However, the testimony of Mr. Kates (N.T. 949–58) demonstrated that the categories were well-defined and that negative information which would constitute one of the designated factors would be found, if at all, at one particular location in the file.

### d. *The categories are too broad.*

Defendants argue that some of the factors chosen for study are so broad that they encompass both trivial matters likely to be ignored in the Police Department evaluation, and serious, potentially disqualifying, matters. There is considerable merit in this contention, particularly with respect to such categories as "arrests," "adult convictions," and "job problems." Plaintiffs have recognized the overbreadth of some of these factors, and are narrowing their scope in order to increase the accuracy of studies based upon them. (N.T. 985–90.) In the meantime, however, it is appropriate to make use of the studies which presently exist. This is a preliminary stage in the proceedings, and plaintiffs need only demonstrate a substantial likelihood of success on the merits. Obviously, the limitations of data based on inadequate factors must be borne in mind, and some caution in evaluating plaintiffs' statistical evidence is indicated. On the other hand, defendants have not demonstrated that the derogatory information collected against black applicants in any of plaintiffs' categories tends to be more damaging than that which exists against white applicants. In the absence of any such evidence, I am not prepared to assume that negative factors attributable to blacks in the "serious" end of the range encompassed by these categories occur so much more frequently than factors attributable to whites as to render plaintiffs' statistics useless.

### e. *Serious inconsistencies exist between coding sheets representing files which were examined twice.*

Defendants presented evidence of 85 or 89 files which were ostensibly examined twice or three times. Compar-

isons of the coding sheets produced for each file demonstrated inconsistencies which would cast significant doubt upon the accuracy of plaintiffs' entire study, if in fact the coding sheets did represent files twice examined. However, examination of the sample "duplicates" introduced by defendants and of plaintiffs' explanation (presented by Mr. Kates, N.T. 962–73) suggests that many of the comparisons are invalid, because the Police Department erroneously copied coding sheets which were incomplete (because the files presented to the coders were incomplete) and compared them with the completed sheets, or made errors in stapling the pages of the coding sheets, or erroneously applied identical numbers to different files. Not all of the discrepancies were explained, and therefore defendants have shown that the coders were not perfectly accurate or consistent. However, it would be surprising if some errors did not appear in an operation of this nature and magnitude. The misleading evidence presented by defendants is insufficient to warrant a finding that the degree of error is greater than that which I would have been prepared to assume.

f. *The coders designated as "reject-ed" some applicants who were not rejected on the basis of the background examination.*

Plaintiffs' coders were instructed to classify as "other" notations in the file that an applicant was rejected for medical reasons after passing the initial physical examination, or declined an appointment to the Police Department, or was ineligible for failure to meet the residence requirement. Obviously it is erroneous to designate such applicants as rejected on the basis of the background investigation, and their inclusion in this category detracts from the accuracy of plaintiffs' data, to the extent that no final order could be entered which relied on it. Plaintiffs have taken steps to cure this defect, however (N.T. 999), and the issue at this stage

of the case is whether the statistics now available are sufficiently reliable to warrant a finding that plaintiffs are likely to prevail on the merits. The only evidence in the record of the relative proportions of blacks and whites erroneously designated as "rejected" with an "other" factor is defendants' study of twelve blacks and 47 whites whom Dr. Siskin's study classified as rejected with one factor. Of the twelve blacks, one (8.33%) was actually rejected as a result of the background investigation; four of the 47 whites (8.51%) were so rejected. In the absence of any showing that the plaintiffs' error affects black and white applicants disproportionately, I conclude that the statistics compiled by Dr. Siskin may validly be utilized at this point.

█ Finally, with respect to all of defendants' challenges to the accuracy of plaintiffs' data, it is significant that apart from these attacks and some minimal efforts to demonstrate that blacks are accepted with more factors than whites (discussed at page 1096, *infra*), defendants have made no real efforts to demonstrate the absence of discrimination at this stage of the hiring process. Of course, plaintiffs have the burden of proving discrimination, but the Court may consider the nature of the defense not only for the purpose of drawing inferences as to the defendants' ability to produce rebutting evidence, but also as support for reliance upon plaintiffs' imperfect statistics, which comprise the only substantial fact-gathering effort in evidence.

B. *Discriminatory Effect*

5. *The rejection rate for blacks is far higher than the rejection rate for whites. This disparity has increased since the Police Department assumed the responsibility for evaluation of the background reports.*

Statistics for 1968, 1969, and 1970, the only complete years available, demonstrate that a far higher percentage of

white applicants than black applicants are accepted following the background investigation. (P–4, p. A–2.)

| | % white accepted | % black accepted |
|---|---|---|
| 1968 | 67.7 | 41.9 |
| 1969 | 59.3 | 21.1 |
| 1970 | 70.8 | 28.3 |

Moreover, the disparity between black and white passing rates has increased significantly since June 1969. Prior to that month the City Personnel Department decided, on the basis of background information obtained by the Police Department, which applicants were to be accepted. Since then, the Police Department has made these determinations. The parties differ as to their characterization of this shift in responsibility, but resolution of that dispute is unnecessary.

| | % white accepted | % black accepted |
|---|---|---|
| 1968 and Jan–June 1969 | 65.4 | 36.4 |
| July–Dec 1969 and 1970 | 67.0 | 23.6 |

(N.T. 103.)

Defendants' rebuttal is meaningless. According to defendants' expert, Dr. Taylor, between 1968 and 1969, the white rejection rate increased by 26%, and the black rate by 35%; this difference is asserted to be "hardly sufficient to support the Plaintiffs' claim of vicious bias." Apart from the fact that the difference is in fact a substantial one, Dr. Taylor has set up the straw man of a trend towards greater discrimination against blacks between 1968 and 1969 and rebutted it, but plaintiffs never purported to compare rejection rates for those years. Their comparison was between 1968 to mid-1969 and mid-1969 to 1970. Dr. Taylor has attempted to rebut the latter figures ("false and misleading!") by challenging the use

of pre-1968 statistics in plaintiffs' calculations. However, as Dr. Siskin makes clear in his report (P–4, p. 3), he did not use pre-1968 figures in these calculations.

C. *Discriminatory Application of Factors Chosen*

6. *Plaintiffs have presented prima facie proof that similarly-situated black and white applicants are not treated alike.*

The approaches taken by the experts on statistics offered by plaintiffs and defendants to the question of discrimination by the Police Department's background evaluators differ considerably. I have concluded that Dr. Siskin's analysis on behalf of plaintiffs presents a far more meaningful picture of the selection process than that offered by defendants' expert.

Dr. Siskin's analysis is in two steps. For each of the 25 factors (plus "other") on the coding sheets, he calculated the likelihood that an applicant with that factor would be rejected. (P–4, p. A–4.) In all 26 cases, the probability of rejection for a black with a given factor exceeded the comparable white probability. (The table is reproduced in Appendix A.) This result alone is not surprising, and does not demonstrate the presence of discrimination, because other figures show that black applicants have, on the average, more negative factors than white applicants. (In the case of 22 of the 26 factors, the proportion of blacks with that factor exceeded that of whites.) Thus, the fact that 66.2% of white applicants with convictions, but 90.5% of black applicants with convictions, were rejected, might be explained by the likelihood that more of the blacks than the whites had other negative factors and were rejected on the strength of all of the derogatory information in the file.[7] Recognizing the inadequacy of

7. The possibility that the black convictions were for more serious offenses, on the average, than the white convictions is considered in Finding 4(c), *supra.*

these figures, Dr. Siskin sought to eliminate the influence of the additional factors by holding the number of factors constant. He found that for every number of factors up to eight, and for nine or more, the probability of a black's rejection exceeded that of a white's. The disparity was often substantial, as in the case of applicants with three factors. The white rejection rate was 26.-8%; the black rejection rate was 53.7%. (See Appendix B.) If it is assumed that all of the factors in this survey are considered and tend to reduce an applicant's chance of acceptance (an assumption which will be dealt with later), these two sets of statistics can be consistent with an absence of discrimination only if black applicants tend to have far more serious factors than white applicants; that is, for example, if the three factors attributable to a black applicant with three factors are likely on the average to be so much more severe than the factors attributable to a white applicant with three factors as to constitute an explanation for the fact that the black rejection rate is twice as high as the white rejection rate for these applicants. Plaintiffs have presented evidence that the factors which tend to occur most frequently among blacks also tend to occur most frequently among whites. (N.T. 256–57, 280–81.) Statistical calculations not in the record may ultimately be presented to show the likelihood, given an applicant has a given number of factors, of any factor's occurrence on his list. In the absence of any such evidence, I must rely on plaintiffs' expert's unrebutted testimony that blacks and whites are likely to have similar factors.[8] Accordingly, I find that the evidence thus far considered does establish a very substantial likelihood that similarly-situated applicants (i. e., those with the same negative information in their files) are not treated alike.

Defendants submit several interrelated statistical rebuttals, none of which is convincing. First, they contend that because accepted blacks in all three years covered by the study had a higher number of negative factors than accepted whites (e. g., in 1970, blacks had 6.46 factors on the average, and whites had 4.12), the Police Department must be more lenient in accepting blacks than whites. But plaintiffs properly point out that black applicants have more factors than whites, and therefore almost any discriminatory or non-discriminatory policy would result in accepted blacks with more factors than accepted whites.[9] Second, Dr. Taylor criticizes Dr. Siskin's table (Appendix B), which demonstrates that whites and blacks with equal numbers of factors are treat-

---

8. This testimony is not inconsistent with the undisputed evidence that blacks tend to have more factors than whites. Rather, Dr. Siskin attempted to answer the question, "Given that an applicant has X number of factors, what factors are they likely to be?"

9. To illustrate, suppose the following distribution of black and white applicants, and suppose the obviously discriminatory (given that by hypothesis nothing is known of the nature of the factors) acceptance rates in the two columns at right.

| Number of Factors | B Applicants | W Applicants | B Acceptance Rate | W Acceptance Rate |
|---|---|---|---|---|
| 0 | 20 | 200 | 80% | 100% |
| 1 | 40 | 160 | 50% | 75% |
| 2 | 100 | 100 | 35% | 50% |
| 3 | 160 | 40 | 10% | 25% |
| 4 | 200 | 20 | 0% | 10% |

Although the process is more lenient to whites at each level, the 87 blacks chosen have an average of 1.59 factors; the 382 whites chosen have an average of .68.

ed differently, on the ground that Dr. Siskin failed to take into consideration the fact that a larger proportion of black applicants were rejected. Dr. Taylor's solution is a table, the significance of which is not readily apparent and is not satisfactorily explained, and the statistics in which are completely consistent with the existence of discrimination.[10]

10. Dr. Taylor's chart (D–8, p. 9):

| Number of Factors | Percentage of black rejects with this number of factors | Percentage of white rejects with this number of factors |
|---|---|---|
| 9 or more | 38% | 32% |
| 8 or fewer | 62 | 68 |
| 7 ” ” | 52 | 58 |
| 6 ” ” | 40 | 46 |
| 5 ” ” | 27 | 36 |
| 4 ” ” | 17 | 28 |
| 3 ” ” | 9 | 18 |
| 2 ” ” | 5 | 11 |
| 1 ” ” | 2 | 5 |
| 0 | 0.2 | 0.1 |

Dr. Taylor purports to derive some significance from the fact that at any given number of negative factors up to nine the proportion of white rejects is substantially greater than is that of blacks. But rather than proving the absence of discrimination, these figures merely reflect the fact that blacks have more factors, on the average, than whites. To demonstrate that these statistics are consistent with discrimination suppose the distribution of applicants and factors in the three columns on the left below. (The result would be identical if, as is the case, a higher proportion of the candidates were white.) Suppose also the discriminatory acceptance rate in the two columns on the right.

| Number of Factors | Black Applicants | White Applicants | Black Acceptance rate | White Acceptance rate |
|---|---|---|---|---|
| 0 | 100 | 1000 | 10% | 100% |
| 1 | 200 | 900 | 9 | 90 |
| 2 | 300 | 800 | 8 | 80 |
| 3 | 400 | 700 | 7 | 70 |
| 4 | 500 | 600 | 6 | 60 |
| 5 | 600 | 500 | 5 | 50 |
| 6 | 700 | 400 | 4 | 40 |
| 7 | 800 | 300 | 3 | 30 |
| 8 | 900 | 200 | 2 | 20 |
| 9 | 1000 | 100 | 1 | 10 |

Inserting the results into a table such as Dr. Taylor's gives the following result:

| Number of Factors | Percentage of black rejects with this number of factors | Percentage of white rejects with this number of factors |
|---|---|---|
| 9 or more | 18.9 | 5.5 |
| 8 or fewer | 81.1 | 94.5 |
| 7 ” ” | 63.3 | 84.8 |
| 6 ” ” | 49.7 | 72.1 |
| 5 ” ” | 37.0 | 57.6 |
| 4 ” ” | 26.3 | 42.4 |
| 3 ” ” | 17.4 | 27.9 |
| 2 ” ” | 10.4 | 15.2 |
| 1 ” ” | 5.1 | 5.5 |
| 0 | 1.7 | 0 |

Third, Dr. Taylor considered with respect to several factors the percentages of rejected whites with the factor and the percentage of rejected blacks with the factor, and the percentages of accepted whites and blacks. Where the first two percentages were roughly equivalent, and the last two were, or where the difference between the two sets of percentages greatly exceeded the difference between the black and white percentages, he concluded that there is no disproportionate rejection rate. Thus, 19.3% of all accepted whites and 19.3% of all accepted blacks had falsified their applications. Similarly, 79.7% of all rejected blacks and 77.1% of all rejected whites were charged with this factor. The size of the difference between rejected and accepted (approximately 60%) greatly exceeds the size of the difference between black and white accepted (0%) or black and white rejected (2.6%), and this purportedly demonstrates the absence of discrimination. That it demonstrates nothing of the sort can readily be shown.[11]

Finally, defendants contend that Dr. Siskin's data is incapable of shedding light on the rejection process because it cannot assist in ascertaining the "cause" of rejection in any particular case. That is, many of the factors chosen by plaintiffs, while present in an applicant's file, might have been disregarded by the person in charge of evaluating the file. In support of this assertion, defendants refer to Civil Service Regulation 8.02, which sets forth the grounds upon which an applicant may be disqualified; defendants contend that an applicant without one of the stated disqualifying factors will be accepted. Plaintiffs attempted to rebut this argument with the testimony of two of the plaintiffs. In both cases, though, the applications contained what might be construed as false information, although trivially false if at all and almost undoubtedly not deliberately false. Since deliberate falsification is a ground for disqualification, I cannot find that plaintiffs have demonstrated conclusively that the Civil Service Regulation is not complied with. Evidence that noncompliance is prevalent, if that is a fact, should be readily available to plaintiffs, and may of course be presented at a later stage in the proceedings. But even without such evidence, defendants' contention does not undermine substantially the validity of plaintiffs' analysis. Under the Civil Service Regulation, an applicant "may" be disqualified if he has one of the listed factors. (N.T. 187.) There is room for the exercise of discretion. Since all negative factors in an applicant's file are considered at least to the extent of placing them on a rejection report if the evaluator recommends rejection (Deposition of Chief Inspector Richard F. Bridgeford, P–10, p. 76), it is plain that the categories set forth in the Civil Service Regulation do not constitute the outer limits of the evaluation. It is appropriate to consider all factors

---

11. Suppose 1,000 black applicants of whom 496 have factor X, and 1,000 white applicants of whom 200 have factor X. Suppose 10 blacks are accepted, of whom 1 has factor X, and 750 whites are accepted, of whom 75 have factor X. Under Dr. Taylor's analysis, 10% of accepted blacks (1 of 10) and 10% of accepted whites (75 of 750) have factor X; 50% of rejected blacks (495 of 990) and 50% of rejected whites (125 of 250) have factor X. The difference between 50 and 10 greatly exceeds the difference between 10 and 10, or between 50 and 50; therefore, there is no discrimination. In fact, however, the rejection rates demonstrate considerable discrimination:

| | White rejection rate | Black rejection rate |
|---|---|---|
| Applicants with factor X | $\frac{125}{200} = 62.5\%$ | $\frac{495}{496} = 99.8\%$ |
| Applicants without factor X | $\frac{125}{800} = 15.6\%$ | $\frac{495}{504} = 98.2\%$ |

which are deemed to be of sufficient importance to warrant inclusion in the file, on the assumption that if they find their way into the file, they will play a role in the evaluation process.[12] There is virtually no evidence of record relating to the decision-making process; none of the six persons who evaluate the background files testified as to what factors they do consider. At minimum, evidence that no attention is paid to derogatory information not set forth in the Civil Service Regulation would be necessary before exclusion of such factors from the analysis would be proper. Moreover, there is some evidence, admissible against some but not all of the defendants, that evaluators have considered factors other than those set forth in the regulation.

In addition to logical conclusions that may be drawn from plaintiffs' fairly complicated statistical data, it may be appropriate to infer unequal treatment from the evidence of rejection rates for the periods before and after the Police Department assumed responsibility for evaluation of background reports. (*See* finding 5, *supra.*) The marked decline in black acceptance after June 1969 makes a finding of discrimination almost inevitable (except in the unlikely event that it can be shown that pre-June 1969 practices favored black applicants, and that the shifts merely ended that bias). Although there is evidence that the Police Department may have adopted a broader definition of disqualifying factor than that which the Personnel Department had used, it may also be the case that the Police Department evaluators do not act in as evenhanded a manner as did their predecessors. Whichever of these or any other possible hypotheses is the case, the defendants have permitted to stand unexplained statistics which cast considerable doubt upon their contention that the background examination is nondiscriminatory.

One consideration not developed in depth by the parties is the effect of positive information in the file. It is not clear to what extent derogatory notations could be offset by evidence that an applicant is otherwise especially well-qualified for employment. If the parties believe that exploration of this area is indicated, testimony from the background evaluators might be particularly helpful. Another area touched upon is the fairness of the fact-gathering procedure; for example, there is conflicting evidence as to whether an applicant is given an opportunity to explain or deny derogatory information which is collected against him.

On the basis of the foregoing, I conclude that plaintiffs have made a prima facie showing that, as between applicants of similar background, blacks are treated less favorably than whites. While it cannot be said that they have conclusively proved that discrimination exists, they have made the necessary showing of a substantial likelihood of ultimate success on the merits to support their claim for preliminary relief.

D. *Discriminatory Choice of Factors.*

7. *Even if the evaluation were performed in a nondiscriminatory fashion, some of the factors relied upon to disqualify applicants would disqualify a disproportionate number of black applicants.*

A determination of whether the factors chosen for evaluation tend to disqualify a disproportionate number of black applicants can be made by reference to the table designated by Dr. Siskin as "Incidence of Factors by Race" (P–4, p. A–5; duplicated in Appendix C), which lists the probabilities that a black or white applicant would have a particular factor. Nondiscriminatory use of these factors to disqualify applicants would disqualify more blacks than whites in the case of 21 factors (plus

12. If defendants wish to press their contention that the Civil Service Regulation governs the evaluations, it might be helpful if the parties could develop correlations among the regulation-listed factors, and between these factors and the others.

"other"); the contrary is true in three cases; both groups would be equally affected in one case.

The record is inadequate to allow me to select the factors the use of which creates a discriminatory effect of sufficient magnitude to warrant requiring the defendants to justify their application. There is no evidence, for example, of whether the disparities between black and white frequencies are statistically significant or merely the result of chance. In the case of those disparities which are insignificant because of the infrequency with which the factor has occurred in the population studied, it may be necessary to study a larger population to determine whether any significant discrimination is likely to result from application of the factor in the future; obviously it would be preferable to limit the scope of the inquiry to applicants for the Police Department, but this may not always be feasible.[13]

It is clear at this point that use of some of the factors employed in the background investigations will be shown to affect blacks to a significantly disproportionate degree. Although I will not speculate as to what the statistics will ultimately demonstrate, it seems appropriate to set forth as an example of such a factor "Illicit or Immoral Conduct," which is attributed to 29.4% of black applicants, a very substantial proportion, and 9.7% of whites, resulting in a large disparity.

8. *The background investigation has not been demonstrated to be job-related.*

It is unquestioned that defendants have concluded no study "validating" the background investigation criteria, i. e., demonstrating that they are job-related.

9. *Validation of the background investigation criteria would be feasible.*

Dr. Barrett testified that it would be feasible to conduct a study to determine whether the background investigation is job-related. It would first be necessary to define successful performance on the job. Next, one could look at the performance records of persons presently on the force who were admitted despite given negative factors, and ascertain whether a correlation exists between those factors and performance. Since none of the factors in plaintiffs' study as presently defined are disqualifying in all cases, there have been accepted between 1968 and 1970 some applicants with each factor. If the number of policemen with a given negative factor is too small to allow the completion of a statistically valid study, it might theoretically be necessary consciously to decide to accept applicants with that factor in order to correlate the presence with job performance. To avoid the obvious risks that this would entail, Dr. Barrett suggests that common sense and experience, and perhaps study by a panel of experts, would make it possible to reject applicants society cannot afford to make policemen. (N.T. 361–64.)

On the basis of Dr. Barrett's unrebutted testimony, I conclude that it would be possible to conduct a study to determine which criteria utilized in the background investigations are job-related. Problems with respect to forced hiring in order to conduct the study can be dealt with as they arise; in many of

---

13. Plaintiffs' expert appears to be most anxious to establish the existence of discriminatory effect with respect to those factors which occur most frequently. Obviously, any remedial action which may be determined to be appropriate will have its greatest effect upon applicants with these factors. However, I am also concerned about the use of court-martial convictions, for example. Although very few applicants have this factor, it is 4½ times as prevalent in blacks, and over 90% of applicants with this factor are rejected. If in fact use of the factor discriminates against blacks who are likely to apply, and if court-martial convictions cannot predict poor job performance *(i. e.,* it is not "job-related"), it would be unfair to penalize a future applicant simply because insufficient numbers of court-martial convictions appeared from 1968 to 1970 to allow a finding of significant disparity.

these cases, it is likely that use of a factor to disqualify will be so obviously appropriate that no statistical showing of job-relatedness would be necessary. *See* Developments in the Law–Title VII, 84 Harv.L.Rev. 1109, 1151–52 (1971).

## V. *Promotion*

10. *The written examination for promotion to ranks above patrolman plays a significant role in determinations of eligibility and eliminates a disproportionate number of blacks.*

There is little evidence in the record concerning the promotion process. It is uncontroverted, however, that a written examination is a very significant factor in determining eligibility for promotion. In the case of promotion to corporal, detective, sergeant and lieutenant, the grade obtained on the examination comprises 90% of an applicant's objective rating, which is considered in conjunction with his supervisor's assessment of his performance; for promotion to higher ranks, the written examination score is assigned a weight of 50%.

Plaintiffs' statistics, which are unrebutted, demonstrate that whites pass at least three of the written promotion examinations at substantially higher rates than blacks:

| TEST | WHITE PASS RATE | BLACK PASS RATE |
|------|-----------------|-----------------|
| Sergeant | 18.4% | 11.7% |
| Detective | 27.2 | 17.7 |
| Corporal | 36.2 | 23.8 |

There is no evidence as to the statistical significance of these figures, nor as to the passing rates for the other promotion examinations.

11. *The written promotion examinations have not been proven to be job-related.*

It is admitted that defendants possess no proof that the written examinations are job-related. Although defendants contend that the tests "satisfy technical criteria for content validity," no evidence of validity has been presented. There is expert evidence (testimony by Dr. Barrett) that to some extent these examinations merely test an applicant's test-taking ability, and are therefore unlikely to be valid.

12. *Underrepresentation of blacks in ranks higher than patrolman may be due in part to discrimination in the selection of patrolmen.*

The percentage of officers who are black decreases for each rank as rank ascends.[14] The statistics do not indicate whether the increasing underrepresentation is caused by a discriminatory written examination alone, or by that in conjunction with other factors. For example, if the entrance examination is deficient in that it measures mere test-taking ability, an applicant might improve his ability by repeated applications (and examinations) until his proficiency was sufficient to allow him to pass. (One of the plaintiffs took the examination eight times before passing.) If such a person would have passed a valid, job-related examination on his first attempt, the discriminatory nature of the invalid examination will have deprived him of some seniority. Since seniority is considered in determining eligibility for promotion (seniority constitutes 10% of an applicant's objective grade), it is ap-

14. RANK | % OF OFFICERS WHO ARE BLACK

| RANK | % OF OFFICERS WHO ARE BLACK |
|------|------------------------------|
| Chief Inspector | 0.0 |
| Inspector | 4.0 |
| Staff Inspector | 5.3 |
| Captain | 5.4 |
| Lieutenant | 5.7 |
| Sergeant | 11.1 |
| Detective | 14.8 |
| Corporal | 15.0 |
| Patrolman | 18.6 |

parent that discrimination in hiring may affect subsequent promotion.

**13.** *There has been no showing that discrimination occurs in stages of the promotion process other than the written examination.*

■ Plaintiffs have not introduced evidence of discrimination in the other two steps of the promotion process: supervisor's rating of performance (for all ranks) and oral examination (for ranks of captain and above). The only evidence bearing on these processes is that all of the administrators of the oral examination are white, which alone does not support a finding of likelihood of proving discrimination.

**14.** *The range of test scores among blacks who pass the written examinations is smaller than the range among whites who pass.*

It is undisputed that the difference between high and low passing scores is less in the case of black applicants, and that blacks tend to be "clustered" at the middle and lower positions on the eligibility lists. Accordingly, the longer a given eligibility list has been used as the source of promotions, the greater the likelihood that the percentage of blacks promoted will more nearly approach equality with the percentage of black applicants.

**VI.** *Future Contemplated Hiring and Promotions*

The Police Department's normal attrition rate is approximately 35 to 40 policemen per month. Typically, approximately 100 applicants are selected to commence training at the Police Academy approximately every two-and-one-half months. Additionally, efforts are being made to secure federal funds in order to hire 900 new police officers. (N.T. 10.) Plans for future promotions are less definite, since promotions tend to be announced sporadically. (*See* N.T. 1081.)

**VII.** *Irreparable Harm*

**15.** *Plaintiffs and the members of the class of plaintiffs would be likely to suffer irreparable harm in the absence of preliminary relief.*

■ Continued use of hiring and promotion practices which discriminate against blacks necessarily causes irreparable injury to those discriminated against, as well as to the public at large. United States by Mitchell v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969).

## SUMMARY AND CONCLUSIONS

■ It is not the function of this Court or any other court to supervise the operation of the Philadelphia Police Department, or to decide who should and who should not be appointed or promoted to positions in the Police Department, or to establish standards of eligibility for appointment or promotion. Within the limits established by the Constitution and applicable legislation, all such matters are within the province of the executive branch of government. The sole obligation of the court is to insure that, in the formulation and implementation of policies and procedures for the hiring and promotion of policemen, constitutional and statutory limitations are not violated.

■ In the seminal case of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court established a simple and straightforward doctrine: any selection requirement or procedure which in fact disqualifies a disproportionately high percentage of blacks is illegal in the absence of affirmative proof that it bears a "manifest relationship to the employment in question" (at p. 432, 91 S.Ct. at p. 854). The absence of discriminatory intent is irrelevant.

The *Griggs* case involved private employment, and was decided at a time when Title VII of the Civil Rights Act of 1964 did not apply to employment

by governmental agencies. Nevertheless, it has uniformly been held that the standards of Title VII and the guidelines established by the Equal Employment Opportunities Commission, as interpreted in *Griggs*, provide "persuasive analogy" for the decision of similar questions in cases involving public employment. *E. g.*, Chance v. Bd. of Examiners, 458 F.2d 1167 (2d Cir., 1972); Castro v. Beecher, 459 F.2d 725 (1st Cir., 1972); Western Addition Community Organization v. Alioto (Waco II), 340 F.Supp. 1351 (N.D.Cal., 1972). Moreover, by virtue of the Equal Employment Opportunity Act of 1972, P.L. 92–261, effective March 24, 1972, 86 Stat. 103. Title VII is now directly applicable to public employment as well as private.

I recognize that the complaint in this case does not invoke Title VII directly, that administrative remedies thereunder have not been exhausted, and that it may be questionable whether pre-1972 statistics alone can provide an adequate basis for invoking Title VII directly. However, the present statutory law may properly be considered in determining the appropriate form of interim relief.

Not all of the findings set forth above are preliminary in nature. While it is conceivable that, on final hearing, the evidence may justify some modification of the findings relating to discriminatory impact of the examinations, discriminatory application of the background investigation process, and discriminatory selection of disqualifying factors, it is an established fact that no attempt has ever been made to validate the background screening process as job-related, and that the examinations have not been validated as job-related. It is virtually inconceivable that the defendants can avoid the ultimate necessity of either validating their present testing and screening procedures in relation to performance on the job, or devising new testing and screening procedures shown to be thus valid.

Unfortunately, the defense of this case to date has been characterized by overreaction at the emotional level, and underreaction at the rational, practical level. The raw statistics, and the probable results of plaintiffs' statistical studies, have been known for more than a year. The defendants have made no independent statistical studies of their own, and have been notably unsuccessful in refuting plaintiffs' conclusions. The law is clear, and has been since before this suit was filed. Surely it should be apparent to all concerned that further delay in undertaking the necessary validations would not be in the best interests of the Police Department or the public generally.

In view of the sensitive nature of the controversy, I believe it particularly important to emphasize the following facts:

1. Requiring that hiring and promotion in the Police Department be done on a basis which does not discriminate against blacks except for reasons related to job performance does not imply a "lowering of standards," but rather an improvement of standards to make certain that they accurately determine, on a non-discriminatory basis, who is and who is not qualified. The fact that some blacks who have been disqualified under the existing procedures may be found qualified under revised procedures does not mean that the standards will have been lowered, in the absence of proof that the existing standards are accurate. In point of fact, while I have not found it necessary to make express findings on this subject, there is persuasive evidence in the record that the present entrance examination is so structured that the passing grade has been lowered to the point where a candidate can pass if he knows the answers to roughly one-third of the questions, and blindly guesses at the rest of the answers. No one flunks out of the Police Academy. Performance on the entrance examination and at the Police Academy have no bearing upon initial job assign-

ments. The only police witness who testified on the subject stated, when asked whether he thought the Police Academy course was helpful in his work as a policeman, only that he thought it was helpful in enabling him to pass subsequent promotional examinations.

2. An interim requirement that hirings and promotions be effected on the basis of at least one black for every two whites does not amount to the imposition of a quota system as such, nor does it discriminate against whites. It merely means that, unless and until the defendants can justify excluding a disproportionate percentage of blacks, they are not legally permitted to do so. The defendants are apparently satisfied that the individuals on existing eligibility lists are properly qualified for appointment or promotion as the case may be. The interim restraints heretofore ordered permit the use of these lists on a neutral basis, *i. e.*, in the same racial proportions as existed among the applicants from whom the eligibles were selected.

3. The morale of the Police Department, and the possible temporary adverse effects upon whites on existing eligibility lists, are matters of grave concern. However, I am unwilling to accept the notion that police morale would be adversely affected by requiring compliance with constitutional and statutory mandates, or that police morale is so fragile that questioning the validity of the procedures which have led to the establishment of existing eligibility lists would shatter it. The morale of minority members of the force and would-be members of the force must also be considered. Moreover, a great many members of the force are the beneficiaries of federal largesse, and substantial additional federal funds to underwrite expansion of the Police Force are now being sought. It would not enhance police morale to place these funds in jeopardy.

Finally, it is important again to emphasize that the Court has not made any finding of intentional discrimination. Neither is there any suggestion that the City of Philadelphia compares unfavorably with other cities in minority employment. On the contrary, it appears probable that Philadelphia has done better than most cities in this respect. However, that fact does not remove the necessity of validating hiring and promotion procedures and eliminating whatever discrimination does exist.

The Police Department of Philadelphia does lag behind other City departments in minority employment. On the present record, the assumption that this is due to the fact that fewer blacks are qualified for police service than for other forms of public employment is precisely that, an untested assumption.

The record shows clearly that, since the Police Department was given the final responsibility for hiring policemen, in mid-1969, there has been a dramatic decrease in the numbers and percentages of blacks hired as policemen. This may very well be attributable to the (perhaps natural) unconscious supposition that the persons best qualified for police work are those who most nearly resemble in attitudes, characteristics, and life styles, the policemen making the selections. But in a City whose black population amounts to nearly 40% of the total, any such approach suggests the conclusion that minorities are incapable of contributing substantially to their own self-government. I find any such supposition totally unacceptable.

■ An order will be entered which continues in effect the existing restraints on hirings and imposes similar restraints on promotions until final judgment in this case. Needless to state, this does not prohibit the defendants from undertaking immediate steps to validate the present testing and promotional procedures in relation to job performance, or to devise new tests and procedures which are so validated.

## APPENDIX A

Probabilities of Rejection Given Factor on Background Exam (Table developed by plaintiffs' expert, Dr. Siskin).

| FACTOR | WHITE | BLACK |
|---|---|---|
| Conviction | 66.2% | 90.5% |
| Arrests | 72.0 | 93.0 |
| Police Contacts | 40.5 | 83.3 |
| Traffic Offenses | 32.4 | 67.5 |
| Juvenile Delinquency | 81.5 | 91.2 |
| Juvenile Arrests | 54.2 | 84.6 |
| Juvenile Police Contacts | 23.4 | 57.1 |
| Court Martial Convictions | 86.7 | 94.7 |
| Summary Offenses in Military | 50.0 | 83.5 |
| Military Arrests | 50.0 | 100.0 |
| Military Discharge | 75.3 | 94.4 |
| No Valid Driver's License | 57.8 | 89.3 |
| Falsification of Application | 63.1 | 87.4 |
| Fired | 74.5 | 94.2 |
| Job Problems | 70.3 | 89.4 |
| Unemployed and/or on Welfare | 38.2 | 75.0 |
| Bad Credit | 68.8 | 89.7 |
| Education Academic Problems | 52.3 | 85.8 |
| Education Discipline Problems | 59.9 | 91.9 |
| Born out of Wedlock | 36.3 | 66.7 |
| Divorce | 67.9 | 79.4 |
| Illicit or Immoral Conduct | 64.7 | 90.0 |
| Alleged Threats or Violence | 81.9 | 95.5 |
| Improper Conduct of Friends or Relatives | 41.8 | 71.5 |
| Bad Appearance | 45.3 | 77.2 |
| Other | 52.9 | 79.2 |

## APPENDIX B

Probabilities of Rejection Given a Given Number of Factors (Table developed by plaintiffs' expert Dr. Siskin).

| NUMBER OF FACTORS | WHITE | BLACK |
|---|---|---|
| 1 | 11.0% | 29.5% |
| 2 | 15.9 | 24.6 |
| 3 | 26.8 | 53.7 |
| 4 | 41.6 | 70.4 |
| 5 | 56.6 | 87.0 |
| 6 | 74.4 | 93.0 |
| 7 | 76.9 | 90.6 |
| 8 | 88.6 | 92.9 |
| 9 or more | 92.2 | 94.1 |

## APPENDIX C

Incidence of Factors by Race (Table developed by plaintiffs' expert, Dr. Siskin.)

| FACTOR | WHITE | BLACK | B%/W% |
|---|---|---|---|
| Convictions | 6.3% | 9.0% | 1.4 |
| Arrests | 11.6 | 18.2 | 1.6 |
| Police Contacts | 1.7 | 1.7 | 1.0 |
| Traffic Offenses | 26.8 | 22.5 | .8 |
| Juvenile Delinquency | 5.1 | 8.0 | 1.6 |
| Juvenile Arrests | 13.7 | 20.1 | 1.5 |
| Juvenile Police Contacts | 6.0 | 3.9 | .7 |
| Court Martial Convictions | .6 | 2.7 | 4.5 |
| Summary Offenses in Military | 15.5 | 21.5 | 1.4 |
| Military Arrests | .4 | 1.5 | 3.8 |
| Military Discharge | 3.0 | 5.1 | 1.7 |
| No Valid Driver's License | 4.2 | 9.3 | 2.2 |
| Falsification of Application | 41.3 | 67.3 | 1.6 |
| Fired | 13.5 | 27.0 | 2.0 |
| Job Problems | 15.6 | 29.3 | 1.9 |
| Unemployed and/or Welfare | 22.3 | 23.7 | 1.1 |
| Bad Credit | 18.8 | 19.2 | 1.0 |
| Education: Academic Problems | 19.3 | 23.8 | 1.2 |
| Education: Discipline Problems | 13.8 | 19.0 | 1.4 |
| Born out of Wedlock | 4.5 | 3.4 | .8 |
| Divorce | 3.2 | 4.8 | 1.5 |
| Illicit or Immoral Conduct | 9.7 | 29.4 | 3.0 |
| Alleged Threats or Violence | 3.0 | 6.2 | 2.1 |
| Improper Conduct of Friends or Relatives | 18.5 | 35.1 | 1.9 |
| Bad Appearance | 24.3 | 40.1 | 1.7 |
| Other | 56.3 | 78.7 | 1.4 |

## ORDER

And now, this 7th day of July, 1972, it is ordered that:

1. Until further order of this Court, the defendants, their agents, employees and any others acting in their behalf, are preliminarily enjoined from hiring any policemen except in the ratio of at least one member of the black race for every two members of the caucasian race;

2. Until further order of this Court, the defendants, their agents, employees and any others acting in their behalf,

are preliminarily enjoined from effectuating any promotions within the Police Department, except that (a) if any of the eight promotions to the rank of Lieutenant and eight promotions to the rank of Sergeant excepted from the restraints imposed by Paragraph 1 of the Order of June 16, 1972, have not yet been made, these promotions may be effectuated, and (b) the defendants may effectuate further promotions in the ratio of at least one member of the black race for every two members of the caucasian race;

3. Except as hereinbefore provided, the Orders entered May 26, 1972, June 16, 1972 and June 30, 1972, are hereby vacated;

4. No security will be required.

## ON MOTION FOR MODIFICATION

On July 7, 1972, I granted a preliminary injunction precluding the Philadelphia Police Department, until final hearing on this case, from hiring additional police officers except in the ratio of one black for each two caucasians. With certain exceptions therein set forth, a similar injunction was issued with respect to promotions within the Police Department. Thereafter, the Third Circuit Court of Appeals granted a partial stay of my order, so as to make it inapplicable to a class of 100 applicants entering the Police Academy in August of 1972.

On September 14, 1972, the Court of Appeals entered judgment as follows:

" . . . That the judgment of the said District Court, filed July 7, 1972, be, and the same is hereby vacated as to those portions of the said District Court's order imposing quota systems on the hiring and promotion procedures of the Philadelphia Police Department, and the cause remanded for further proceedings consistent with the opinion of this Court."

The Court of Appeals mandate issued on September 20, 1972.

The plaintiffs now seek a modification of this Court's order of July 7, 1972, in order to bring the same in conformity with the Court of Appeals mandate and the opinion in support thereof. If plaintiffs' request were granted, the order of July 7, 1972 would be reaffirmed, with the addition of clarifying language to specify that the further hirings and promotions, on the basis of the two-to-one ratio, were to be made "from the existing eligibility lists of qualified candidates or new lists formed by the existing procedures as required by the City Charter."

In support of the requested modification, plaintiffs point to certain language in the opinion of the Court of Appeals:

"Because this order does not, certainly on its face, limit the pool from which applicants are to be chosen to those necessarily qualified to be policemen, the district court has in this respect abused its discretion in formulating an appropriate remedy." (Slip op. p. 5)

"Such failure to demonstrate test-validity cannot be used, however, to suggest that those who have been disqualified under that procedure are in fact qualified. And absent such a showing and a finding that a particular applicant is qualified, the district court erred in fashioning appropriate relief by ordering the Police Department to hire, if it chooses to hire at all, applicants, black or white, who may be unqualified." (Slip op. p. 6)

"Because the present order is not limited to requiring the Police Department to hire from a pool of applicants of demonstrated qualifications, we must vacate that portion of the order dealing with a quota system in hiring." (Slip op. p. 7)

Plaintiffs argue that the quoted language demonstrates that the Court of Appeals was under the misapprehension that this Court's order of July 7, 1972 required or permitted the defendants to hire or promote police officers who have not been certified as eligible pursuant to existing hiring and promotional procedures. Plaintiffs point out, quite properly, that this Court's order did not have

such effect, and that any such result could not lawfully occur by reason of various provisions of the City Charter.

If the changes now sought by plaintiffs would in fact alter the effect of this Court's order of July 7, 1972, plaintiffs present application might properly be entertained. But, in all candor, it must be stated that the addition of the clarifying language suggested by plaintiffs would in no way alter the purpose and effect of the order of July 7. It must be remembered that at no time have the defendants been precluded from utilizing the existing testing and screening procedures, nor have they been precluded from utilizing existing eligibility lists, or further eligibility lists created in accordance with existing procedures, in carrying out the new hirings and promotions permitted by this Court's order. No one has ever contended, and defendants certainly could not be heard to argue, that those certified as eligible under existing procedures are not in fact qualified to be policemen. Indeed, these aspects of the injunctive order were discussed at some length in this Court's earlier opinions in this case, particularly the opinion of May 31, 1972, denying the defendants' application for a stay order.

■ It is not within the province of a District Court to consider, let alone discuss or evaluate, plaintiffs' assertion that the appellate court misapprehended the order appealed from, or that the reasons set forth in the opinion of the appellate court for partially vacating the District Court's order should be deemed to justify reinstatement of the vacated order instead. All such assertions, if they are to be raised at all, should be presented to the appellate court, and not to this Court.

The sole function of this Court is to carry out the mandate of the Court of Appeals. As stated at the outset, the mandate requires that certain portions of this Court's order be vacated, and remanded the case "for further proceedings consistent with the opinion of this Court." The remaining question, there-

fore, is to determine what further proceedings would be proper in view of the appellate opinion. Moreover, since the appeal was from the grant of a preliminary injunction, and since the reversal dealt only with a portion of the preliminary remedy previously afforded, it seems clear that this Court is not relieved of the obligation of determining whether other kinds of preliminary relief should be granted.

In this connection, it should be mentioned that the case is now in a somewhat different posture than when the July 7 order was entered. In the 18 months during which this case was pending before the order of July 7 was entered, the defendants steadfastly refused to acknowledge any deficiency in their testing and screening procedures, and had consistently refused to take any action in an attempt to validate the tests and procedures as being job-related. Indeed, the defense witnesses uniformly took the position that it is not possible to validate as job-related any testing or screening procedure relating to police officers. At the hearing on the present application on September 22, 1972, this Court was advised that, at oral argument before the Court of Appeals, present counsel for the defendants informed that Court that efforts were under way either to validate the existing tests and procedures, or to devise new tests and procedures which would be valid; and counsel for the defendants reiterated that position at the hearing before this Court on September 22, 1972. The opinion of the Court of Appeals contains the following language:

" . . . [I]n framing appropriate relief it is proper to establish a deadline of January 1, 1973, by which time the defendants must demonstrate to the district court that the present tests and procedures for hiring and promotion are job-related and valid or must submit new tests and procedures properly validated. . . ."

At the time this Court's order of July 7 was entered, it was contemplated that the case would be ready for final hearing

in the fall of 1972. By reason of the foregoing statement of the appellate court, it is now apparent that no final disposition of the case can occur until after January 1, 1973. Hence, the duration of any interim relief will be somewhat longer than previously anticipated.

Another factor of considerable importance lingers in the background. At the hearings which led to the entry of the preliminary injunction on July 7, 1972, it was established that the current budget of the Police Department contemplates the expansion of the Police Force by the hiring of some 900 policemen over and above the previously existing complement of the force; but it was represented by counsel for the defendants that no such expansion could occur in the foreseeable future, because it was dependent upon the receipt of federal funds. At the present hearing, the Court was advised that various officials of the defendants City have suggested in the public press that these funds are now or soon may become available, and that the defendants intend to achieve the expansion of the Police Force as soon as possible. I am confident that the Court of Appeals did not intend to permit unfettered recourse to existing hiring practices which have been shown to be presumptively discriminatory, in achieving any such large-scale expansion of the Police Department. Any such result would make it extremely difficult, if not impossible, for the plaintiffs to obtain meaningful relief, even if they were finally and completely successful on the merits.

Because the present record does not adequately reveal the intentions of the defendants with respect to additional hirings and promotions during the interim between now and January 1, 1973, and because the Court lacks current information as to the number of vacancies now existing or likely to occur through attrition between now and January 1, 1973, it is not possible to determine whether the order of July 7, 1972, with merely the so-called "quota" provision deleted, would do justice to the parties,

in view of the possible present needs of the Police Department, and particularly in view of the possible expansion of the Police Department. Accordingly, I believe it appropriate to require the defendants to furnish the necessary information within 10 days, and in the meantime to refrain from hiring or promoting any policemen. Obviously, this does not preclude the defendants from taking whatever action they deem appropriate to establish new eligibility lists or expand existing eligibility lists.

## ORDER

And now, this 22nd day of September, 1972, it is hereby ordered:

1. That, within 10 days from this date, the defendants shall furnish to the Court and make a matter of record, by affidavit or otherwise, the following information:

a. The complement of the Police Department as it existed on March 1, 1972.

b. The number of vacancies in the complement of the Police Department which existed on March 1, 1972.

c. The complement of the Police Department as it exists on this date, September 22, 1972, and the number of vacancies in that complement remaining to be filled.

d. The highest number of vacancies in the Police Department at any time since January 1, 1970; and the lowest number of vacancies in the Police Department since January 1, 1970.

e. The number of additional vacancies expected to occur by attrition or otherwise, per month, between this date and January 1, 1973.

f. To the extent feasible, the same information required by the preceding subparagraph, with respect to promotions.

2. That, until the expiration of two business days following receipt and filing of the foregoing information, the defendants are enjoined from hiring or promoting any members of the Police Department. The defendants are, however, at liberty to establish additional

or supplemental eligibility lists in accordance with existing procedure.

## ON MOTION FOR STAY

 The defendants have applied for a stay of paragraph 2 of this Court's order of September 22, 1972, pending appeal therefrom. The Order directed the defendants to supply certain information with regard to existing vacancies on the Police Force, and the defendants' intentions with respect to additional hirings and promotions in the near future; this information was to be supplied within ten days from September 22, 1972; paragraph 2 of the Order temporarily restrained the defendants from hiring or promoting additional policemen until the expiration of two business days following production of the required information.

Thus, the effect of the Order is to restrain the defendants from hiring additional policemen, or promoting policemen, for a period which might be as little as two days, and which will not exceed twelve days, from September 22, 1972.

The mandate of the Court of Appeals clearly does not, as the defendants apparently seem to believe, leave the defendants free to undertake whatever additional hirings and promotions they see fit during the pendency of this litigation. All that was invalidated was that portion of this Court's Order of July 7, 1972, which the Court of Appeals interpreted as imposing a quota system in connection with such hirings and promotions. This Court is still faced with the necessity for determining whether there should or should not be any other form of limitation or restriction upon hiring and promotion within the Police Department during the interim.

This involves accommodation of conflicting considerations, not the least of which are the needs of the public and the plans of the Police Department itself.

Because it has not been possible, up to this point, to obtain any firm commitment or definite information from the defendants on these subjects; because of the prospect that the defendants may seek to accomplish, by interim action with regard to hiring and promotions, the possible objective of rendering the entire litigation virtually moot; and because, from the fact that the defendants never saw fit to avail themselves of the opportunities for hiring additional policemen which were afforded by this Court's Order of July 7, 1972, I concluded that there would be no substantial harm to the public in delaying any further hirings and promotions for a period of from two days to twelve days, but that such delay would be desirable in order to enable the Court to obtain and act upon the necessary information. Accordingly, the Order of September 22 was entered, and for the same reasons, the present application for a stay will be denied.

## MEMORANDUM ON ANSWERS TO INQUIRIES

On September 22, 1972, an order was entered requiring the defendants to supply certain information concerning the size of the authorized complement of the Philadelphia Police Department at various times, and the number of vacancies therein at various times.

On September 26, 1972, counsel for the defendants delivered to my chambers the defendants' "Answer" to these inquiries. While it is apparent that defense counsel have attempted to comply literally with the order of September 22, their attempt has been only partially successful. Although the order required that the information be made a matter of record, the information was not filed of record (except to the extent that delivery to chambers may be regarded as a filing thereof); more important, the defendants failed to advise opposing counsel of the filing, or to furnish copies to opposing counsel. (Copies were made available to plaintiffs' counsel by the Court on September 28, 1972.)

Moreover, the defendants have apparently misinterpreted the order, and as a result have filed only a small part of the information requested with regard to promotions.

And finally, the information supplied can be understood only when there is added to it the further fact, not disclosed in the defendants' answer, that all of the figures shown for dates after July 1, 1972, include the Fairmount Park Police, which group was assimilated into the Philadelphia Police Department as of July 1, 1972. I have been advised informally that this had the effect of increasing the total membership of the Police Department by some 533 men.

The record, interpreted in the light of the foregoing information, establishes the following facts: As of March 1, 1972, there were 7,488 members of the Police Department. There were ·176 vacancies. The total complement of the Department was 7,664. As of September 22, 1972 (with the addition of the 533 Park Police), there were 8,082 members of the Police Department. There were 115 vacancies. The total complement was 8,197. During the entire period from January 1, 1970 to September 22, 1972, the vacancy rate varied from a low of 4 vacancies to a high of 772 vacancies.

As of March 1, 1972, there were 5,953 men employed as patrolmen, and there were 101 vacancies in that rank. As of September 22, 1972, there were 6,458 men employed as patrolmen, and 24 vacancies in that rank.

Since March 1, 1972, the defendants have hired 198 new patrolmen (98 on April 10 and 100 on August 10); and approximately 30 policemen have been added to the force through reinstatement (after military leave, etc.). As a result of these additions, there are now approximately 61 more persons employed as policemen than were employed on March 1, 1972.

The defendants estimate that approximately 96 persons presently employed on the Police Force will, as a result of attrition, no longer be employed on the Police Force as of January 1, 1973. Thus, to maintain the Police Force at its present strength, it would be necessary to hire 96 new policemen between now and January 1, 1973. The average size of an entering class at the Police Academy is approximately 100. Thus, one further class at the Police Academy would, in all probability, be more than sufficient to maintain the present level of police employment.

Evidence at an earlier hearing (hearing of April 20, 1972, transcript pp. 191–92), establishes that Philadelphia now has at least as many policemen per capita as any other major American city. There is nothing in the record to suggest that the public safety or public welfare would in any way be jeopardized if the Police Department continues at its present size until mid-January 1973, after the defendants have complied with the validation procedures mandated by the opinion of the Court of Appeals. The validity of this conclusion is supported by the pattern of hiring which has been followed during the past two years, and particularly during the period since July 7, 1972.

On the other hand, it must be remembered that the existing testing and screening procedures are presumptively invalid, and certain features of the present procedures will almost certainly have to be changed before validity could be established (for example, treating as "negative factors" such matters as illegitimate birth, divorce, or juvenile police contacts not resulting in adjudication of delinquency). Such invalidity has been reasonably apparent for at least 18 months, and has been quite clearly apparent for at least a year. Throughout the progress of this litigation during the past 18 months, this Court, in conference after conference, has sought to encourage the parties to make such adjustments as would obviate the necessity for judicial intervention in this sensitive area. Nevertheless, the defendants have uniformly declined to take corrective action in any respect, except for the recently advanced suggestion that efforts are now being made, either to gather evidence that the present procedures need no correction, or that new

tests and procedures will be devised. While it is clear that, in conformity with the mandate of the Court of Appeals, the defendants must be afforded a further opportunity, until January 1, 1973, to validate or correct their testing and screening procedures, I do not understand that the appellate court has concluded that any further expansion of the Police Force should occur in the interim.

Plaintiffs have made a strong argument that no further hiring should be permitted, on the basis of present tests and procedures, pointing out that the Police Force is at considerably greater numerical strength now than ever before, and that failure on the part of the defendants to avail themselves of the further hiring which this Court's order of July 7, 1972 would have permitted amounts to a self-inflicted wound. It is a fact that, for whatever reason, no concrete action to enlarge the size of the Force has been proposed in the past two years, except when imposition of restraints was being debated.

Whatever may be the force of plaintiffs' arguments, I do not believe that the defendants should be restrained from maintaining the present level of police employment. I believe any such restraint would be inconsistent with the spirit of the actions taken thus far by the Court of Appeals in this litigation. By the same token, however, I am convinced that no additional hiring for expansion purposes should be permitted under present procedures, and that only attrition during the period between now and January 1, 1973 should be considered.

There are now 24 patrolman vacancies, and an estimated 87 more patrolman vacancies can be expected to occur by January 1, 1973. This makes for an estimated total of 111 patrolmen. There are 125 persons on the remaining eligibility list who are available for employment. I have concluded that justice would best be served by permitting the defendants to hire these 125 persons.

## MEMORANDUM

At 3:30 p. m. on this date, I filed a Memorandum and Order setting forth the limits within which the defendants would be permitted to hire additional policemen during the interim between now and January 15, 1973. Thereafter, at 4:20 p. m., I learned of the entry this date of a further Order by the Court of Appeals, vacating the earlier temporary restraining order which had been entered by me on September 22, 1973.

Although my Order of September 22, dealt with by the Court of Appeals, has been superseded by the Order entered earlier today, it is clear that no part of today's order which conflicts with the action taken by the Court of Appeals should be permitted to stand. Accordingly, I have carefully reconsidered my Order. I am satisfied that it is entirely consistent with, and indeed carries out precisely, the views expressed by the Court of Appeals. I therefore conclude that no further action need be taken at this time.

## ORDER

And now, this 30th day of September, 1972, it is ordered:

1. That the defendants shall, on or before January 1, 1973, present evidence sufficient to establish either that the existing testing and screening procedures have been validated as job-related, or that new testing and screening procedures which are valid as job-related have been adopted.

2. That, unless otherwise ordered by this Court, the defendants are enjoined from hiring additional policemen not presently employed as such, until January 15, 1973, except that the defendants may, from the existing eligibility lists, hire 125 additional policemen during that period.