**WESTERN ADDITION COMMUNITY ORGANIZATION et al., Plaintiffs,**

v.

**Frank N. ALIOTO et al., Defendants.**

**No. 701335.**

United States District Court,
N. D. California.

Feb. 7, 1972.

Sidney M. Wolinsky, Amanda Fisher, S. F. Neighborhood Legal Assistance Foundation, Robert Gnaizda, Cruz Reynoso, California Rural Legal Assistance, Oscar Williams, NAACP Legal Defense and Educational Fund, Hector N. Ortez, Mexican-American Political Association, Louis Garcia, Mexican-American Legal Defense and Educational Fund, San Francisco, Cal., for plaintiffs.

Thomas M. O'Connor, City Atty., San Francisco, Cal., Davis, Cowell & Bowe, San Francisco, Cal., for Fire Fighters Union.

Brundage, Neyhart, Grodin & Beeson, San Francisco, Cal., for Edward Tatari-

an & Civil Service Commission of San Francisco.

William J. Murphy, San Francisco, Cal., for Robert Cutone, and others.

·MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This case, brought under the 1871 Civil Rights Act, 42 U.S.C. §§ 1981 and 1983, is before the court on plaintiffs' motion for reconsideration of this court's Memorandum and Order of January 8, 1971, 330 F.Supp. 536, denying (without prejudice) further use of certain Civil Service Commission's examination format and practices used for testing applicants for positions in the San Francisco Fire Department.

## BACKGROUND OF THE CASE

Since the background of this case is set forth in that Memorandum we merely summarize the findings and conclusions therein set forth.

The 1800 man San Francisco Fire Department includes only 4 Negroes—although Negroes constitute 14 per cent of the City's population.

Of the 1883 applicants who took the written test for the 1968 Fireman H–2 Civil Service examination, 1713 were White, 101 were Negro and 69 Mexican-American. Of the 1713 Whites, 626 (37%) passed; of the 69 Mexican-Americans, 24 (35%) passed; of the 101 Negroes, 12 (12%) passed—a 3 to 1 disparity as between Whites and Negroes.

It is the law that where the hiring practice of a public agency (even though the agency does not intend to discriminate against minority groups) actually produces a situation in which the percentage of minority group persons employed is grossly and disproportionately less than the percentage of minority group persons in the general population, such effect alone, although it does not necessarily render the method of selection constitutionally defective, does render the method of selection suf-

ficiently suspect to make a prima facie case of unconstitutionality and shifts to the public agency the burden of justifying the use of generalized hiring tests by demonstrating that there is a reasonably necessary connection between the qualities tested in the examination and the actual requirements of the job to be performed. (See Griggs v. Duke Power Company and other cases cited infra).

As of the date of this court's previous order of January 8, 1971, defendants had not met that burden. Nevertheless, the court refrained from issuing a preliminary injunction at that time because, as explained in the previous Memorandum (pp. 6–8), the court, noting that defendants were aware of the grossly disproportionate representation of minorities in the Fire Department and that defendants were evidently desirous of correcting that condition, initiated discussions between the plaintiffs and the intervenors and a Civil Service Commission Task Force with a view to the possibility for improving minority representation without impairing departmental efficiency.

Those discussions resulted in arrangements for modification of the Fireman's H–2 Civil Service examination—including a newly constructed written test. These modifications, including the newly constructed written test (Court's In Camera Exhibit 2) were used for the next Fireman H–2 Civil Service Examination given in September, 1971.

The modified examination comprised two steps: First, a qualifying, pass-fail written examination, consisting of 130 questions of which 90 (70%) were required to be correctly answered to qualify an applicant for the second stage of the examination. The second stage consisted of an athletic test and an oral test upon which the qualified applicants were rated to determine the order of their eligibility on the Fireman H–2 Civil Service list.

## THE PRESENT ISSUE

Plaintiffs have now placed before the court the results of the 1971 Civil Serv-

ice examination, mainly the results of the written test, contending that it is still in its effect racially discriminatory.

They point out that the newly developed 130 question written examination was taken by 1741 applicants—1187 White, 221 Spanish-Oriental and 333 Negroes. Of the 1187 Whites, 57% passed; of the Spanish-Oriental, 40% passed; of the 333 Negroes, 20% passed. In other words, plaintiffs emphasize, three times as many Whites passed (percentage-wise) the written test as Negroes—maintaining the 3 to 1 percentage-wise written test disparity in favor of Whites against Negroes.

Thus, the burden still remains upon the defendants, members of the Civil Service Commission, to demonstrate to this court that the qualities tested in the written test are actually and necessarily job related. On this issue a hearing has been held and extensive, detailed affidavits, documents and testimony have been presented by the parties.

It appears from this evidence that the written test was constructed in two parts—one part consisting of 40 multiple-choice questions (Nos. 90–130) excerpted from certain Fire Department Training Manuals, was put together by the Commission for the purpose of testing the ability of applicants to read and understand the Manuals which are used in the Department as a basis for further tests during a fireman's training period and later used for reference purposes; a second part, consisting of a set of 90 questions on mechanical comprehension, practical choice, non-verbal reasoning, special visualization and arithmetic (Nos. 1–90), was purchased by the Commission upon the belief that these questions had been used successfully by another public agency.

This written test was then submitted to Jay Rusmore, Professor of Psychology at San Jose State College and experienced in test construction, who reviewed the test and also obtained and read some of the Training Manuals. He proposed some changes including a "glossary" as a means of explaining to the applicants the meaning of terms excerpted from the Training Manuals which, according to Rusmore, were "detailed, extensive, highly technical, unnecessarily complex—and could have been written in simpler form." After adopting some of Rusmore's suggestions, the written test was put to use in the September, 1971 Fireman's H–2 Civil Service examination.

## THE LAW

In the Civil Rights Act of 1964 (Title VII, Sec. 703(a) (2), (h) [42 U.S.C. § 2000e–2(a) (2), (h)]) the Congress undertook to deal by statute with the subject of racially discriminatory hiring practices of private employers.[1]

The Act makes it an "unlawful employment practice" for an employer, "to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. . . . Notwithstanding any other provision of this title, it shall not be an unlawful employment practice for an employer . . . to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin."

The Equal Opportunity Employment Commission (EEOC) (to which the Act entrusts enforcement responsibility) has issued comprehensive and detailed guidelines concerning hiring tests. Guide-

1. Although the 1964 Civil Rights Act, the Guidelines issued thereunder and cases interpreting and applying the same, deal with statutory requirements applicable only to private employers, they are helpful and persuasive in considering the analogous constitutional issue raised in cases (like the present one) brought under the earlier Civil Rights Act, Title 42 §§ 1981–1983 against public agencies.

lines on Employee Selection Procedures (Federal Register, Vol. 35, Title 29, Chap. XIV, Part. 1607, §§ 1607.1–1607–14).[2]

The Supreme Court of the United States in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) has interpreted the requirements of the 1964 Civil Rights Act in a case in which the employer contended that, absent an intent to discriminate, a "professionally developed ability test" could not be held to be an unlawful employment practice.

The court rejected that contention and held that, even when the employment test has been professionally developed without any intent to discriminate, the test is not to be given controlling force if it in fact operates to disproportionately exclude a racial group—unless it is "demonstrably a reasonable measure of job performance," adding "More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question (p. 432, 91 S.Ct. 849) . . . If an employment practice which operates to exclude Negroes, cannot be shown to be related to job performance, it is prohibited." (p. 432, 91 S.Ct. p. 854) . . . "The Equal Employment Opportunity Commission, having enforcement responsibility, has issued guidelines interpreting § 703(h) to permit only the use of job-related tests. The administrative interpretation of the act by the enforcing agency is entitled to great deference . . . Since the Act and its legisla-

tive history support the Commission's construction, this affords good reason to treat the guidelines as expressing the will of Congress." [3]

The method by which an employer shows that a given hiring test is related to job performance is called "validation" in the Guidelines to which the Supreme Court refers. In the parlance of experts "test validation" means that the test has a known significant relationship to actual performance on the job. Generally speaking, there are two kinds of test validation: empirical validation and content-construct validation.

Empirical validation means that an actual comparison of the test scores of individuals with their on the job proficiency ratings indicates a high degree of correlation between the test scores and the job performance.

Defendants in our pending case concede that empirical validation is the preferred method of validating any hiring test. They contend, however, that for several reasons empirical validation of the written test here in question was not feasible and, therefore, has never been attempted.

Defendants rely upon what they claim to be what is called content-construct validation which, they point out, is recognized by the Guidelines as a permissible, alternative method of validation when empirical validation is not feasible. (See, EEOC Guideline 1607.5). Content-construct validation means that, although there has been no empirical validation, the manner in which the test has

2. The Secretary of Labor has enacted similar guidelines, enforceable by the Office of Federal Contract Compliance (OFCC) and dealing with employee testing and other selection procedures by public contractors and subcontractors (Federal Register Title 41, Chap. 60, Part 60–3, §§ 60–3.1—60–3.18.

3. See also the following cases which apply these principles to public agency hiring practices. Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) (involving the Minneapolis Fire Department) ; Chance v. Board of Examiners, 330 F.Supp. 203

(S.D.N.Y.1971) (involving supervisory personnel of the New York Board of Education) ; Arrington v. Mass. Transit, 306 F.Supp. 1355 (D.C.Mass.1969) (involving drivers for Massachusetts Transit Authority) ; Penn v. Stumpf, 308 F.Supp. 1238 (N.D.Cal.1970) ; (involving Oakland Police Department) ; Morrow v. Chrisler, F.Supp. (D.Miss.1971) (involving Mississippi Highway Patrol) ; Castro v. Beecher, 334 F.Supp. 930 (D.Mass.1971) (involving Boston Police Department) ; Compare, United States v. Porter, 296 F.Supp. 40 (D.C.Ala.1963), (involving a private employer).

been developed is, nevertheless, such as to indicate a known relationship between the subject of the test and performance on the job.

However, both the Guidelines and the cases above cited make clear that any kind of validation, particularly the so-called content-construct kind of validation asserted in our pending case, must be based upon a careful *job analysis*.

The very EEOC Guideline, Section 1607.5, which recognizes content-construct validation, also provides as a minimum standard for any such content or construct validation, that it "should be accompanied by sufficient information *from job analyses* to demonstrate the relevance of the content . . . or the construct . . . Evidence of content validity alone may be acceptable *for well developed* tests that consist of suitable samples of the essential knowledge, skills or behaviors comprising *the job* in question. . . ." (emphasis added)

The Office of Federal Contract Compliance (OFCC) Guidelines, § 60–3.5(b)(3) also provide as a minimum requirement that "whatever criteria are used, they must represent major or critical work behaviors as revealed by *careful job analysis*." (emphasis added).

THE EVIDENCE

Indeed, defendants expressly acknowledge that "the Guidelines seem to require a *job analysis* as a minimum requirement for each of the alternate test validations;" defendants also concede that "the issue in this court seems to be whether the defendants have done a *job analysis* prior to giving the subject examination." (See, Defendant's Brief of 1/18/72, p. 6, lines 14–19). (emphasis added).

Counsel for defendants assert that in this case the Commission complied with this minimum requirement for a job analysis. But, it is difficult for this court to accept or even to understand that contention because both of defendants' own expert witnesses have testified to the contrary and agree with all of plaintiffs' expert witnesses that no such job analysis has ever been made.

Defendants' expert, Rusmore, testified: "The City has never undertaken a detailed analysis of the fireman's job which would provide a basis for identifying all the human characteristics contributing to high quality fireman performance." (Affidavit of Rusmore, 11/24/71, p. 2, lines 16–19). Rusmore, according to his hearing testimony, had earlier recommended a "detailed job study," stating that he could not say that the Training Manuals from which 40 of the questions were excerpted were themselves "job related" and stated also that a glossary would have helped to translate some of the Manual's technical language into simple language and that if he had done the job himself, he would have gone into the Department to observe the field.

Defendants' other expert, Harrell, testified: "How job related is the written test? The answer is unknown at present. . . ." "No job analysis is presently available but could and should be made;" he recommended that "a job analysis be made" and stated that "upon having a job analysis, the written test could then be studied to determine whether it should be revised." (Affidavit of Harrell, 1/3/72, p. 3, lines 9–10; p. 4, lines 9–10; p. 7, lines 20–21).[4]

As far as the second part of the written test is concerned, i. e., that part which was purchased in the belief that it had been used successfully by another agency, there is not only a failure to show a job analysis, but also a failure to show that the Commission had any basis

---

4. Defendants' counsel attempt to correct the Commission's failure to make any job analysis prior to the September, 1971 examination by subsequently filing in this proceeding an affidavit of Fire Chief Keith P. Calden briefly and generally explaining the duties of a fireman—a subject which the Commission might well have explored much further and much earlier.

for believing that those questions had been validated in any acceptable way for use by firemen in any other public agency—only information concerning the reputation of the test.

But, Guideline, Section 1607.8, expressly provides that "under no circumstances will the general reputation of a test, its author or its publisher, or casual reports of test utility be accepted in lieu of evidence of validity."

CONCLUSIONS

■ The law does not preclude the use of testing procedures; obviously they are not only useful, but necessary; nor does the law require that the less qualified have preference over the better qualified simply because of minority origins. Far from disparaging job qualification as such, the law requires a positive showing that it really *is* the controlling factor to the exclusion of any racial discrimination. (Griggs v. Duke, supra.)

It may be that the examination here in question can be justified as being actually and necessarily related to fireman job performance. However, it is not just a matter of reading the examination itself. This court has no expertise in matters of this kind. It must depend upon the Commission's ability to produce evidence of some kind of professional or other acceptable validation based upon a careful job analysis.

It is apparent from the record in this case that defendants have not only failed to meet their burden of showing by a preponderance of evidence that the test in question was actually and necessarily job related within the meaning of current law, but also they have virtually confessed through their own witnesses that they are just unable to do so.

This is doubly regrettable first, because with a little more effort to comply with the fairly well-established requirements of the law in this field, they might have been able to do so; secondly, there is no doubt that the Commission, far from entertaining any intent to ra-

cially discriminate, means well and has tried in its own way to improve minority representation in the Fire Department without impairing departmental efficiency, including not only its earlier efforts to modify the Civil Service examination but also its separate and very helpful Fireman Safety Technician program (under contract with EEOC) designed to help minority groups prepare themselves for eventual classification as H–2 Firemen.

■ However, for the reasons hereinabove set forth and in the light of the record before it, this court has no alternative other than to grant a preliminary injunction herein, enjoining defendants from using the examination herein referred to, or the results or ratings thereof, to determine Fireman H–2 Civil Service eligibility except upon such terms and conditions as may hereinafter be ordered by the court in a formal decree to be filed after further hearing or conference with counsel.

This Memorandum constitutes the Findings and Conclusions of the Court within the meaning of Rule 52 of the Federal Rules of Civil Procedure.