The **OFFICERS FOR JUSTICE** et al., Plaintiffs,

v.

The **CIVIL SERVICE COMMISSION OF** the **CITY AND COUNTY OF SAN FRANCISCO** et al., Defendants.

Civ. No. C–73–0657 RFP.

United States District Court, N. D. California.

Nov. 26, 1973.

Thomas M. O'Connor, City Atty., Michael C. Killelea and Philip S. Ward, Deputy City Attys., San Francisco, Cal., for defendants.

Robert L. Gnaizda, Sidney M. Wolinsky, Jo Ann Chandler, Charles R. Lawrence III, Public Advocates, Inc., Lowell Johnston, William Bennett Turner, William E. Hickman, NAACP Legal Defense and Educational Fund, San Francisco, Cal., for plaintiffs; William H. Hastie, Jr., San Francisco, Cal., of counsel.

O'Byrne & Beirne, San Francisco, Cal., for intervenor, San Francisco Police Officers Ass'n, a corporation.

## MEMORANDUM OF DECISION

PECKHAM, District Judge.

Plaintiffs bring this civil rights suit against the San Francisco Civil Service Commission and the Police Commission of San Francisco challenging, inter alia, the hiring and promotion procedures of the San Francisco Police Department. Plaintiffs invoke 42 U.S.C. §§ 1981, 1983; the Fourteenth Amendment to the United States Constitution; and provisions of the California state constitution. Plaintiffs invoke this court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3), 1343(4), 2201. Intervening as a defendant is the San Francisco Police Officers' Association.

Plaintiffs now move for a preliminary injunction suspending the current use of written tests for both hiring and promotion. As an alternative to the current testing procedures, plaintiffs seek the imposition of ratio hiring of whites and minorities until defendants develop and validate adequate written tests. Defendants oppose this motion and move to dismiss the action.

Plaintiffs seek to bring this suit as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure.[1] The equitable relief which plaintiffs seek through the present motion will benefit all individuals similarly situated. Therefore, designation of the class of plaintiffs need not be determined at this time. Bailey v. Patterson, 323 F.2d 201, 207 (5th Cir. 1963); Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, 354 F.Supp. 778, 783 (D.Conn.1973), modified on other grounds, 482 F.2d 1333 (2nd Cir. 1973).

## INTRODUCTION

This case presents extraordinarily sensitive issues for this court's determination. Plaintiffs, on one hand, properly seek vindication of their civil rights under both federal and state constitutions. They emphasize the great value of securing an end to any unlawful discrimination by the Police Department in both hiring and promotion. Minorities obviously benefit when their employment opportunities within a civil agency increase. In addition, all citizens

---

1. Plaintiffs seek to represent a class composed of, "all those Blacks, Latins, and Asians . . . and women who (i) have failed either in entry-level or promotional examinations promulgated by the CIVIL SERVICE COMMISSION and POLICE COMMISSION for a position in the San Francisco Police Department and are fully qualified therefor or (ii) may become eligible to take such examinations to be given in the near future, or (iii) have passed such examination but because of a lack of seniority have not been appointed to the position applied for or (v) have been eliminated from contention for the position of sworn officer by reasons of certain biased elements in the applicant screening procedures of the CIVIL SERVICE COMMISSION and POLICE COMMISSION or their delegates or (vi) will in the future be subjected to any of the discriminatory treatment alleged . . . or (vii) have in the past been discouraged and dissuaded from even attempting to join the department due to the discriminatory reputation of its selection devices, standards, and practices or (viii) have been discriminated against in assignment, choice of duties, or other incidents of employment, or (ix) who as a result of the above detailed practices and their exclusionary effects are deprived of protection and safety in minority neighborhoods equal to that available in non-minority areas." (footnotes omitted) See plaintiffs' original complaint.

profit when the city achieves a racially integrated police force of qualified individuals who are knowledgeable of the diverse problems of different ethnic groups and who are not prey to destructive hostility from minorities who feel excluded from full participation in city government life. Clearly, the general harmony of the community is enhanced by the city's obtaining a police force representative of its population. Defendants, on the other hand, justifiably fear court intervention in police hiring and promotion practices. They stress the complexity of designing employment policies and of selecting specific individuals for varying job categories. Federal court supervision of city employment policies, without question, cannot substitute for enlightened leadership by city and police officials. Court intervention, at best, stimulates concerned parties to develop and implement policies which not only comply with the law but also advance general community interests. In any case, court supervision can only be justified where there has been intentional or unintentional encroachment on individual rights secured by federal and state law.

These truisms indicate the delicate nature of the issue before this court. They of course, do not indicate whether, under federal law, preliminary relief in the present case is justified, or, if so, what form it should take.

Fortunately, numerous decisions by other federal courts in cases involving public employment discrimination provide this court with extensive, carefully reasoned discussion of the legal issues at stake in this case. Several courts of appeals have considered the legal doctrines involved in attacks on the hiring and promotion policies of city agencies, including police and fire departments. See, e. g., Bridgeport Guardians, Inc., et al., v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333 (2nd Cir. 1973); Commonwealth of Pennsylvania v. O'Neill, 473 F.2d 1029 (3rd Cir. 1973) (en banc); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Chance v. Board of Examiners, 458 F.2d 1167 (2nd Cir. 1972); Carter v. Gallagher, 452 F.2d 327 (8th Cir. 1972) (en banc) cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). Also, many recent district court decisions elaborate on the types of equitable remedies which properly may be invoked once a finding of unlawful discrimination in public employment has been made. See, e. g., Davis et al. v. County of Los Angeles, et al., No. 73-63 WPG (C.D.Cal. June 7, 1973); Arnold et al. v. Ballard, et al., No. C-73-478 (N.D.Ohio May 14, 25, 1973); Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D. Md.1973).

## DISCUSSION

### 1. The Showing of Discrimination

Plaintiffs' complaint seeks relief from sexual as well as racial discrimination, from the use of non-written tests as well as written tests in the selection procedures, and from the use of a seniority system. The motion presently before this court concerns only alleged racial discrimination resulting from the use of written tests and the seniority system. Plaintiffs' challenges to the admission test and to the promotional examinations will be considered seriatim.

Plaintiffs attack the use of a general aptitude test as the test for admission into the police department. Applicants for the position of patrolman must pass this test before the enrollment process can proceed. Plaintiffs, alleging that the test does not relate to performance as a patrolman, contend that the examination has had an adverse effect on the opportunity of minority applicants to enter the police department.

Plaintiffs present impressive evidence to support this contention. Statistics compiled for defendants show significant disparities in the passing rates between whites and all others taking the exam. Data for the years 1969 to 1972 reveals that whites taking the admission test for patrolman passed the test with a frequency more than five times

greater than minorities.[2] This disparity greatly exceeds the disparities existing in comparable cases in which courts have found that plaintiffs have established a prima facie showing of discrimination. See, *e. g.*, Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333 (2nd Cir. 1973) (whites passed at 3½ times the rate for all others); Castro v. Beecher, 459 F.2d 725, 729 (1st Cir. 1972) (whites passed at more than two times the rates for any other group); Chance v. Board of Examiners, 458 F.2d 1167, 1171 (2nd Cir. 1972) (whites passed at 1½ times the rate for all others); Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1089–1090 (E.D.Pa.1972), affirmed in relevant part 473 F.2d 1029 (3rd Cir. 1973) (en banc) (whites passed at more than 1¾ times the rate for all others). Also, a statistical comparison between the approximate proportion of minorities in the population of San Francisco and in the police department shows a grave disparity which suggests discriminatory hiring practices. The 1970 Census figures reveal that the city's population at that time was 14 per cent black, 15 per cent Latino, and 14 per cent Asian. The representation of these minority groups within the police department at present is 4.41 per cent for blacks, 4.05 per cent for Latinos, and 0.88 per cent for Asians.[3] A few courts have held that a substantial disparity between the proportion of minorities in the general population and the proportion in a specific job classification—in itself—equals sufficient evidence to establish a prima facie showing of discrimination. *E. g.*, Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Western Addition Community Organization v. Alioto, 330 F.Supp. 536, 539 (N.D.Cal.1971). Other courts have noted that such a disparity provides supporting evidence for a finding of discrimination. *E. g.*, Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1335 (2nd Cir. 1973); Castro v. Beecher, 334 F.Supp. 930, 935–936 (D.Mass.1971); modified 459 F.2d 725 (1st Cir. 1972). *Cf.* McConnell Douglas Corp. v. Green, 411 U.S. 792, 805 n. 19, 93 S.Ct. 1817, 36 L.Ed. 2d 668.

Plaintiffs, in short, present more than enough evidence to establish a prima

2. Statistics for entry-level admission examinations for the years 1969–1973 (29 examinations) reveal the following:

| Number of Persons Taking Examinations | | Number of Persons Passing Examinations | Percentage Passing |
|---|---|---|---|
| Whites | 3364 | 1830 | 54 per cent |
| Blacks | 653 | 28 | 4 per cent |
| Latinos | 308 | 47 | 15 per cent |
| Asians | 74 | 24 | 32 per cent |
| Others Not Identified | 21 | 6 | 29 per cent |
| Total | 4399 | 1936 | 44 per cent |

Thus, the passing rate for whites was approximately 54 per cent, while the passing rate for all minorities, when figures for the different minority groups are cumulated, was approximately 9.8 per cent—producing a passing frequency ratio of more than five to one. See Plaintiffs' Exhibit G.

3. The ethnic count made by the EEOC of the police department taken at the order of this court, divided "minorities" into more than three groupings and included a figure for American Indians (0.47 per cent of the police force). Their categories of Spanish-surnamed and Spanish born have been added together to form the "Latino" group referred to within this Memorandum and Order. See EEOC Exhibit 4.

facie case of de facto discrimination with respect to San Francisco's procedures for the hiring of patrolmen.

■ Plaintiffs also attack the use of achievement tests for promotion of policemen within the department ranks. These tests for advancement consist of multiple-choice questions formulated by police and civil service personnel from a bibliography of literature on modern police practices. Scores on the tests, along with seniority and a good record, determine promotion to the sergeant, assistant inspector, lieutenant, and captain positions. Plaintiffs argue that the tests have had an adverse effect on the opportunities of minority policemen for advancement within the department.

Statistics concerning promotion in recent years support plaintiffs' contention with respect to promotion to the rank of sergeant. For example, on the most recent examination for promotion to the rank of sergeant, whites passed the examination with a frequency more than three times greater than minorities.[4] On other examinations within the last six years, whites consistently passed at a frequency greater than minorities.[5] The disparity in passing rates between whites and minorities exceeds the disparities existing in many comparable cases in which courts have held that plaintiffs have established a prima facie showing of discrimination. See, e. g., Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1335 (2nd Cir. 1973); Castro v. Beecher, 459 F.2d 725, 729 (1st Cir. 1972). See, generally, cases cited *supra*. As a result of this disparity in passing rates, less than three per cent of the sergeants in the police department are black, Latino, or Asian. The evidence, in short, establishes a prima facie showing of de facto discrimination with respect to the sergeant examination.

■ Statistics concerning promotion in recent years to the ranks of assistant inspector, lieutenant, and captain, however, present a different story. The small number of minority persons at the patrolman and sergeant levels necessarily restricts the number of minority persons eligible to take the higher-level promotion examinations. For example, only eleven of the 205 persons taking the August, 1972 lieutenant examination were minorities, and only one of the

4. Statistics for the promotion-level sergeant examination of January 9, 1971 reveal the following:

| Number of Persons Taking Examination | | Number of Persons Passing Examination | Percentage Passing |
|---|---|---|---|
| Whites | 642 | 116 | 18 per cent |
| Blacks | 35 | 0 | 0 per cent |
| Latinos | 24 | 3 | 12.5 per cent |
| Asians | 3 | 0 | 0 per cent |
| Others Not Identified | 3 | 0 | 0 per cent |
| Total | 704 | 119 | 17 per cent |

Thus, the passing rates for whites was approximately 18 per cent, while the passing rate for all minorities, when figures for the different minority groups are cumulated, was approximately 5 per cent—producing a passing frequency ratio of more than three to one. See Plaintiffs' Exhibit B.

5. The promotion-level sergeant examination was given in 1967 and in 1968 as well as in 1971. In 1967, whites passed the examination at a substantially higher frequency than minorities. In 1968, whites passed at a slightly higher frequency than minorities. See Plaintiffs' Exhibit B.

hundreds taking the last three captain examinations was a minority. This court can find that plaintiffs have established a prima facie case of discrimination only if the relative numbers of whites and minorities taking a particular examination allow for a statistically reliable statement of the examination's differential effects. *E. g.*, Bridgeport Guardians, Inc. et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1338–1339 (2nd Cir. 1973), modifying 354 F.Supp. 778 (D. Conn.1973). *Cf.* Commonwealth of Pennsylvania v. O'Neill, 473 F.2d 1029, 1031 (3rd Cir. 1972), modifying 348 F. Supp. 1084 (E.D.Pa.1972). The large number of whites and minorities who have taken the sergeant examination— when the results of tests in recent years are cumulated—allows for a finding that plaintiffs have presented a prima facie showing of discrimination with respect to the sergeant examination. In contrast, the small number of minority persons who have taken the higher-level promotion examinations precludes a similar finding with respect to the higher-level promotion examinations. Clearly, whites have passed the lieutenant and captain examinations at a higher frequency than minorities.[6] To borrow the words of a recent decision, "[w]hile this . . . may have some statistical significance, the numbers on which it is based are too small to have constitutional significance." Bridgeport Guardians, Inc., et al. v. Members of Bridgeport Civil Service Commission, 354 F.Supp. 778, 795 (D.Conn.1972), modified on other grounds 482 F.2d 1333 (2nd Cir. 1973). But see Chance v. Board of Examiners, 330 F.Supp. 203, 210–211 (S.D.

N.Y.1971) aff'd 458 F.2d 1167 (2nd Cir. 1972). Undoubtedly, as more minority persons enter the police department and seek promotion through its ranks, the statistical significance of the possible differential effects of the higher-level promotional examinations will become clear. Presently, this court is constrained to find that, given the limitations of the statistics concerning the respective examinations, there has been no showing of substantial de facto discrimination with respect to the promotion examinations for the assistant inspector, lieutenant, and captain ranks.[7]

### 2. The Burden of Proof

■ The discussion *supra* indicates that plaintiffs have established a prima facie case of de facto discrimination only with respect to San Francisco's procedures for hiring patrolmen and for promotion to the rank of sergeant. This showing shifts to the city the burden of justifying the use of the procedures despite their discriminatory effect. See, *e. g.*, Bridgeport Guardians, Inc. et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1335–1339 (2nd Cir. 1973); Commonwealth of Pennsylvania v. O'Neill, 473 F.2d 1029 (3rd Cir. 1973); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1972), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

The extent of this burden of justification, of course, depends on the requirements of the particular equal protection test that this court invokes. *E. g.*, Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972).

---

6. Statistics concerning promotion to the position of assistant inspector present the exception to the general trend of discrimination against minorities revealed by an analysis of other examinations. Until 1972, promotions to this position from the ranks of patrolmen were made by appointment. To date, one examination (in August, 1972) has been administered. The passing rates for whites and blacks were approximately the same while the passing rate for Latinos was slightly lower.

However, the small number of individuals taking the single examination preclude any determination concerning the possible discriminatory effect of the examination on minority advancement within the police department.

7. In accordance with this finding, the promotion-level captain examination papers, impounded at the direction of this court, are hereby ordered released.

Invocation of the "compelling governmental interest" test for equal protection does not appear appropriate in this case. The stringent standard for judicial review imposed by this test has been applied when the state either classifies on the basis of a suspect criterion such as race or limits the exercise of a fundamental constitutional right. See San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The present controversy differs from cases in which this standard has been applied. This case does not involve intentionally discriminatory legislation, see, *e. g.*, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); does not concern a legislative statute, neutral on its face, which has been applied in an intentionally discriminatory manner, see, *e. g.*, Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); does not, in fact, involve the use of a factor for classification identified as "suspect," *cf.* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Also, it does not concern the deprivation of a constitutional right deemed fundamental by the Supreme Court. *Cf.* San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 33, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). See also Shapiro v. Thompson, 394 U.S. 618, 658–660, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (Harlan, J. dissenting). Courts, given the prevailing line of Supreme Court decisions cited *supra*, have reasoned that the "compelling governmental interest" test need not be invoked in cases involving claims of de facto discrimination in public employment. *E. g.*, Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972). This approach comports with a practical consideration of the effect of adopting the stringent standard. "The compelling interest test, at least in its full rigor, has not been used, probably out of a concern that this test, which is rarely met, would invalidate all sorts of governmental actions which do not impose classifications based on race, even though they can be shown to have in varying degrees a racially discrimina-

tory effect." Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 354 F.Supp. 778, 788 (D.Conn.1973), modified on other grounds 482 F.2d 1333 (2nd Cir. 1973).

At the same time, invocation of the less rigorous standard of the "rational relationship" test for equal protection violations also does not appear appropriate for this controversy. The use of this standard may be "adequate where the initial showing is simply that a plaintiff or class of plaintiffs has been excluded from employment by the classification." Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972). The state classification in dispute in this case—the passing of a test with an objective score high enough to gain either admission or advancement—might appear, at first glance, to have little connection with any "suspect" classification. *Cf.* McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960). However, this classification, as the discussion supra indicates, has produced results which disproportionately correlate with race and, therefore, has caused a discriminatory effect. See Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2nd Cir. 1968).

Courts in comparable cases, recognizing the sui generis nature of the problem of racial discrimination in public and private employment, have articulated a standard for judicial scrutiny of employment classifications which falls "somewhere between the traditional rational basis and compelling necessity criteria the courts have employed in Equal Protection cases." Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1337 (2nd Cir. 1973). The Supreme Court in cases brought under Title VII of the Civil Rights Act of 1964 has defined an appropriate standard for determining the validity of employment classifications. "The touchstone is business necessity. If an em-

ployment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Courts of appeals in cases based solely on the equal protection clause of the Fourteenth Amendment have adopted this standard. "The public employer must . . . in order to justify the use of a means of selection shown to have a racially disproportionate impact, demonstrate that the means is in fact substantially related to job performance." Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972). This standard places a "heavy burden" of justification on the defendant. Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1337. The Supreme Court, at least indirectly, has approved this approach to the resolution of cases concerning the selection and promotion of public employees. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n. 14, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (citing with approval First and Second Circuit opinions in the public employment area).

### 3. The Validity of the Examinations

■ "[C]ourts confronted with challenges to public employment examinations predicated upon the equal protection clause of the Fourteenth Amendment have generally agreed that the Guidelines issued by the EEOC provide persuasive standards for evaluating claims of job-relatedness." Vulcan Society v. Civil Service Commission, 360 F.Supp. 1265, 1273 n. 23 (S.D.N.Y.1973). See, e. g., Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1337 (2nd Cir. 1973); Castro v. Beecher, 459 F.2d 725, 729 (1st Cir. 1972); Carter

v. Gallagher, 452 F.2d 315, 320, 326, affirmed in relevant part, 452 F.2d 327 (8th Cir. 1971) (en banc), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Western Addition Community Organization v. Alioto, 340 F. Supp. 1351 (N.D.Cal.1972). These Guidelines, which follow principles of professional psychological testing set out in the Standards of the American Psychological Association, state that,

> Evidence of a test's validity should consist of empirical data demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated. 29 C.F.R. § 1607.4(c).

The Guidelines, in effect, allow for the use of two approaches to the question of "validation": the employer can attempt to show either "predictive validation" or "content validation." These, of course, are general terms which encompass various definitions of validity.[8]

Predictive validation requires substantial evidence that "there is a correlation between a candidate's performance on the test and his actual performance on the job." Chance v. Board of Examiners, 458 F.2d 1167, 1174 (2nd Cir. 1972). In practice, predictive validation requires the testing of a group of candidates; the recording of their scores; the observation and recording of their performance on the job over a period of time; and, finally, a determination that scores on the test positively correlate at a high level of statistical significance with performance on the job.

Content validation demands a detailed analysis of the requirements of the job and the translation of that analysis into carefully formulated test questions. See generally Western Addition Community Organization v. Alioto, 340 F.Supp. 1351,

---

8. Compare Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 354 F.Supp. 778, 788–789 (D. Conn.1973), modified on other grounds 482 F.2d 1333 (2nd Cir. 1973), with Western Addition Community Organization v. Alioto, 340 F.Supp. 1351, 1354–1355 (N.D.Cal.1972), for an appreciation of the various labels given to various approaches to the problem of validation.

1354–1355 (N.D.Cal.1972). The job requirements normally are "determined through empirical studies conducted by experts." Chance v. Board of Examiners, 458 F.2d 1167, 1174 (2nd Cir. 1972). The formulation of the test questions usually requires the attention of an individual skilled in psychometrics in order to insure that the questions test knowledge or skills relevant to the job. *Cf.* Cooper and Sobel, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv. L.Rev. 1598 (1969).

The EEOC Guidelines, it should be noted, allow for the use of content validation studies only when the use of predictive validation studies is not feasible. These regulations have the force of law in cases involving claims brought under Title VII under the Civil Rights Act of 1964. Griggs v. Duke Power Co., 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Decisions concerning actions brought under the equal protection clause of the Fourteenth Amendment leave unclear whether employers can carry their heavy burden of justification merely by showing that an adequate *content* validation study exists. *E. g.*, Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 354 F.Supp. 778, 792 (D.Conn.1973), modified on other grounds 482 F.2d 1333 (2nd Cir. 1973). *Cf.* Western Addition Community Organization v. Alioto, 340 F.Supp. 1351, 1354–1355 (N.D.Cal.1972). In the present case, this court need not determine whether defendants can only meet their burden of proof by establishing predictive validity. The evidence presented in the submitted papers of the parties and at the oral hearing clearly establishes that defendants have not adequately validated either the entry-level admission examination or the promotion-level sergeant examination through any acceptable form of validation.

The admission examination, in light of the principles of validation noted *supra*, has no claim to validity. In fact, defendants conceded in open court at the hearing that the examination failed to satisfy any set of validation criteria. This court's expert [9] in the field of psychometrics, called as a witness during the hearing, presented the reasons for this lack of validity. In terms of predictive validation, defendants had made no effort to have the admission examination constructed according to the standards articulated by the EEOC Guidelines. The court's expert, in determining the examination's validity, compared the scores of candidates on the entry tests with the scores they later received on tests after spending time in training at the police academy. He found that all individuals performed, in rough terms, equally well on the latter test, regardless of how well they performed on the former examination. This finding, the expert concluded, formed positive evidence of the *invalidity* of the entry-level examination. In terms of content validation, the examination fails on two counts. First, no competent job analysis had been completed. Thus, it is impossible to ascertain any relation between the examination questions and the job requirements. Second, the expert found discrepancies among the 29 tests used for the admission examination in terms of the types of questions used and the weight assigned to answers. For example, on one test the mathematical and verbal aptitude questions might have relative weights of two to one, whereas on another test the ratio might be reversed. This evidence obviously reveals that no consistent relation had been established between what was being tested and its importance to performance on the job. In short, defendants failed to make any

9. Plaintiffs and defendants agreed to the court's appointment of William Burns, formerly Chairman of the Technical Advisory Committee on Testing to the California Fair Employment Practices Commission and currently employed in the Personnel Research division of Pacific Gas and Electric, as the court's expert for the preliminary proceedings.

systematic attempt to formulate the requirements of the job and to construct a test that measured knowledge, skills or attitudes necessary for satisfactory job performance.

The promotion-level sergeant examination also was not adequately supported by a presentation of evidence establishing its validity.

In terms of predictive validation, the evidence indicates that defendants had made no significant attempt to determine the predictive validity of the sergeant examination. Defendants once again had not performed any type of statistical analysis necessary to meet EEOC Guidelines.

In terms of content validation, defendants had made some efforts to relate examination questions to information presumably related to successful performance of the sergeant position. Police captains selected a number of books on police practices and formulated questions for the promotion-level examinations based on the contents of the books. The police department supplied candidates with a bibliography of the works from which examination questions were drawn. Essentially, the examinations are achievement tests, measuring the ability of the candidates to read and remember material from volumes on police work, sociology, and related fields. Defendants contend that these procedures equal a job analysis guaranteeing content validity. They argue that the police officials responsible for constructing the examinations evaluated the requirements of the job positions and attempted to select materials directly related to those requirements.

Defendants contentions are erroneous on at least three grounds. First, the police did not engage in a thorough job analysis in the correct sense of the term. Their informal studies do not satisfy the provisions of the EEOC Guidelines, see 29 C.F.R. § 1607.5, and, in the opinion of the court's expert, do not provide sufficient basis for any type of validity study. Second, the construction of the examination does not reveal the careful attention to the selection of questions necessary to insure that the examination accurately tested candidates' knowledge, skills, or attitudes. The police officials followed no consistent methodology in selecting material for the examination. The court's expert testified that he could not ascertain the psychometric justification for presenting certain questions concerning specific areas of social science knowledge. He joined with plaintiffs' experts in the conclusion that the types of skills measured by the questions on the examination, including reading ability and rote memorization ability, do not include all or most of the skills that empirical studies have found relevant to the performance of police work. In effect, the sergeant examination simply requires a detailed knowledge of the contents of less than a dozen books. In contrast, successful performance of the sergeant position demands a variety of skills and traits which the sergeant examination fails to consider. Third, defendants provide no evidence that the cut-off score for passing the examination has any relation to job performance. Defendants' witnesses testified the score was selected arbitrarily. The Court's and plaintiffs' experts agreed that many of the candidates who "failed" the examination might still be qualified for a supervisory position. Without a proper job analysis and a validity study, it is simply impossible to determine what kind of examination and what cut-off score would truly separate the qualified from the unqualified. In this respect, the promotion-level sergeant examination violates the explicit standard of the EEOC Guidelines. See 29 C.F.R. § 1607.6. Clearly, the promotion-level sergeant examination has not been established as a validated test.

Defendants, it must be emphasized, have the heavy burden of justifying the use of the entry-level admission examination and the promotion-level sergeant examination by producing evidence of successful validation studies. *E. g.,* Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service

Commission, 482 F.2d 1333, 1335–1339 (2nd Cir. 1973); Commonwealth of Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1102–1103 (E.D.Pa.1972), aff'd in relevant part 473 F.2d 1029 (3rd Cir. 1973); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal.1972). "Mere surmises by the defendants . . . cannot justify the use of employment qualifications which will have a discriminatory impact on minority groups." Carter v. Gallagher, 337 F.Supp. 626 (D.Minn.1971) aff'd in relevant part 452 F.2d 327 (8th Cir. 1971) (en banc), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). Rather, defendants "must come forward with convincing facts establishing a fit between the qualification and the job." Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972).

This court finds that defendants have failed to meet this burden of proof at this stage of the proceedings. The weight of the evidence clearly favors the plaintiffs' allegation that the entry-level admission examination and the promotion-level sergeant examination have not been shown, through the presentation of adequate validation studies, to be substantially related to job performance.

### Remedy

▇ This "district court, sitting as a court of equity has wide power and discretion to fashion its decree not only to prohibit present discrimination but to eradicate the effects of past discriminatory practices." Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1341 (2nd Cir. 1973). See generally Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); United States v. Wood, Wire and Metal Lathers, Local 46, 471 F.2d 408, 413 (2nd Cir. 1973), cert. denied 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). Cf. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 429 (8th Cir. 1970).

This power includes the authority to construct an equitable remedy which involves the imposition of the requirement of ratio-hiring on a public agency in order to correct past discriminatory conduct and to avoid the repetition of any such conduct in the future. See, *e. g.,* Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333 (2nd Cir. 1973) (Bridgeport, Connecticut police department); Commonwealth of Pennsylvania v. O'Neill, 473 F.2d 1029 (3rd Cir. 1973) (en banc), modifying 348 F.Supp. 1084 (E.D.Pa.1972) (Philadelphia, Pennsylvania police department); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972) (Boston, Massachusetts police department); Carter v. Gallagher, 452 F. 2d 327 (8th Cir. 1971) (en banc), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) (Minneapolis, Minnesota fire department); Erie Human Relations Commission v. Tullio, 360 F. Supp. 628 (W.D.Pa.1973) (Erie, Pennsylvania police department); Davis, et. al. v. County of Los Angeles, et al., No. 73–63 WPG (C.D.Cal. June 7, 1973) (Los Angeles, California fire department); Arnold, et al. v. Ballard, et al., No. C–73–478 (N.D.Ohio May 14, 25, 1973) (Akron, Ohio fire department); Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D.Md.1973) (Baltimore, Maryland fire department); NAACP v. Allen, 340 F.Supp. 703 (M.D. Ala.1972) (Alabama state police).

▇ The use of the remedy of ratio-hiring, though sometimes disparagingly termed "inverse discrimination," comports with basic principles of constitutional adjudication. "[T]he Constitution is color conscious to prevent discrimination being perpetrated and to undo the effects of past discrimination." United States v. Jefferson County Board of Education, 372 F.2d 836, 876 (5th Cir. 1966), aff'd in relevant part 380 F.2d 385 (5th Cir. 1967) (en banc). Thus, this "court has not merely the power but the duty to render a decree which will so far as possible eliminate discriminatory effects of the past as well

as bar discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). The Supreme Court, in describing the limits of remedial relief aimed at curing discriminatory effects, has given its approval to the use of mathematical ratios in shaping an equitable decree. See Swann, et al. v. Charlotte-Mecklenburg Board of Education, et al., 402 U.S. 1, 25, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Lower federal courts, citing to both the Louisiana v. United States and the Swann, et al. v. Charlotte-Mecklenburg Board of Education, et al. opinions, have, in fact, reasoned that the Constitution's provisions require nothing less than the imposition of ratio-hiring in certain public employment cases. *E. g.*, Erie Human Relations Commission v. Tullio, 360 F.Supp. 628, 629–631 (W.D.Pa.1973).

■ Preliminary relief is appropriate at this stage in the proceedings. The record before this court, as the discussion *supra* indicates, establishes that plaintiffs are extremely likely to prevail on the merits. *Cf.* Williams v. San Francisco Unified School District, 340 F.Supp. 438, 450 (N.D.Cal.1972). Also, the balance of equities in this controversy favor the granting of immediate relief. The history of discrimination caused by the use of examinations which have not been properly validated must be reversed before additional individuals are hired for the rank of patrolman or promoted to the rank of sergeant. At the same time, the changing of hiring and promotion procedures within the police department must be accomplished without significant disruptions in the recruitment of police which might jeopardize the public safety. In short, both the legal rights of the plaintiffs and the social needs of the community require that this controversy be resolved as expeditiously as possible. These factors suggest the need for extensive preliminary relief. See Costandi v. AAMCO Automatic Transmissions, Inc., 456 F.2d 941 (9th Cir. 1972). Compare Tuxworth v. Froehlke, 449 F.2d 763, 764

(1st Cir. 1971) with Nolop v. Volpe, 333 F.Supp. 1364, 1369 (D.S.D.1971). Courts in comparable cases involving claims of discriminatory employment by public agencies have found the granting of preliminary relief especially appropriate. To borrow the words of a recent opinion, "refusing the injunction would continue racial discrimination and deny plaintiffs and others like them any real opportunity for appointment until a final decision on the merits, by which time many positions would have been filled." Chance v. Board of Examiners, 458 F.2d 1167, 1178 (2nd Cir. 1972). In the present case, a balancing of similar factors reveals the need for the granting of preliminary relief.

In granting preliminary relief, this court wishes to emphasize two points.

First, no remedy ordered by this court will require the hiring or the promotion of any individual not qualified for a particular position. Plaintiffs, it should be noted, do not desire a "lowering of standards." Rather, they legitimately seek an improvement of police department hiring and promotion procedures to insure that they accurately separate— on a non-discriminatory basis—individuals who are qualified from individuals who are not. See Western Addition Community Organization v. Alioto, 340 F.Supp. 1351, 1356 (N.D.Cal.1972). In fact, this court has the authority to alter police department examination policies only because defendants have failed to prove that either the entry-level admission examination or the promotion-level sergeant examination are substantially related to job performance. A remedy ordered by this court which attempts to cure the effects of discriminatory hiring and promotion will, if only indirectly, result in the formulation and the use of examinations which accurately test individuals for the police jobs for which they are applying. Thus, successful resolution of this controversy will have two benefits. On one hand, plaintiffs will gain vindication for their Fourteenth Amendment equal protection rights. On the other hand, all the citi-

zens of San Francisco will profit not only from seeing an end to unlawful discrimination which has prevented the creation of a police department representative of the city's population but also from knowing that the selection of qualified policemen will be accomplished through the use of carefully constructed and properly validated examinations. See generally Commonwealth of Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1103 (E.D.Pa.1972), modified on other grounds 473 F.2d 1029 (3rd Cir. 1973) (en banc).

Second, events since plaintiffs initiated this action offer the hope that the Civil Service Commission and the Police Commission will soon have access to properly validated examinations for the hiring and the promotion of qualified individuals.

City officials have been working on the improvement of police department hiring and promotion examinations. At the oral hearing, defendants represented to this court that they were making every effort to produce validated examinations by the end of this year. Hopefully, recent announcements by city officials concerning police department selection procedures which have appeared in the San Francisco media are a prelude to successful completion of work on validating needed hiring and promotion examinations.

Also, the California Selection Consulting Center, a state agency established under the Intergovernmental Personnel Act of 1970, 42 U.S.C. § 4701 et seq., has been engaged in the development and the testing of examinations for the selection of individuals for employment in public agencies such as police departments. City governments, though not directly participating in the development program, may use specific examinations formulated by the agency as long as regional factors are not likely to affect validity. Cf. 29 C.F.R. 1607.7. The passage of a city charter amendment at the November, 1973 general election now allows for this city's use of the standardized, carefully tested employment examinations formulated by this agency.

In short, the San Francisco Civil Service Commission and the Police Commission now may have the opportunity to utilize validated examinations as an alternative to the examinations previously used.

Plaintiffs, in sum, have established their right to preliminary relief. They are entitled to an equitable decree, at this stage of the proceedings, which eradicates the effects of past discrimination by defendants in hiring and promotion and which forestalls the reoccurrence of any such discrimination in the future. Courts in comparable cases have formulated an equitable remedy after consideration of the percentage of minorities currently employed by the particular public agency compared with the percentage of minorities within the general population. E. g., Bridgeport Guardians, Inc., et. al. v. Members of the Bridgeport Civil Service Commission, 354 F.Supp. 778, 783 (D.Conn.1973), affirmed in relevant part 482 F.2d 1333 (2nd Cir. 1973). Courts, in constructing the appropriate equitable remedy, tend to require the public agency to hire minorities at a rate high enough to bring the percentage of minorities employed closer to the percentage of minorities in the population within a relatively short period of time. In NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972), Judge Johnson required the Alabama state police to hire black applicants at a rate of 50 per cent of all individuals hired, whereas blacks represented 25 per cent of the general population, until the percentage of blacks in the police force reached parity with the percentage in the population. As another example, in Davis, et al. v. County of Los Angeles, et al., No. 73–63 WPG (C.D.Cal. June 7, 1973), Judge Gray ordered the Los Angeles County fire department to hire minority applicants at a rate of 40 per cent of all individuals hired, whereas minorities equalled approximately 19 per cent of the general population, until reaching parity. These, and many other,

decisions recognize the need to cure past discrimination through the use of ratio-hiring so that plaintiffs' rights under federal law are upheld and so that citizens might gain the benefits of having the particular public agency staffed by individuals representative of the general population. No less an authority than Charles Gain, former Police Chief for the City of Oakland, has stated that "specific and substantial minority employment quotas are the most effective method for securing a racially-ethnically balanced police force within the next ten years." See Affidavit of Charles R. Gain.

■ In the present case, this court is faced with the difficult task of reducing the substantial disparity between the percentage of minorities in the police department and the percentage of minorities in the general population. Of approximately 1920 policemen, approximately 180 are correctly classified as minorities—thus, only 9 per cent of the police department are minorities. In contrast, approximately 43 percent of San Francisco's population in 1970 was composed of minorities according to the 1970 Census; and approximately 51 per cent of the population in 1975 will be composed of minorities according to Census Bureau projections. In short, this court finds that the discrimination worked against minorities by police department hiring and promotion examinations not proved to be substantially related to job performance has resulted in a substantial gap between the number of minorities in the police department and the number of minorities in the general population. As the discussion, supra, indicates, federal and constitutional law, as articulated by both Supreme Court and lower court decisions, leaves this court with no alternative other than the granting of an equitable remedy which will alleviate, with due speed, the past effects of discrimination and will prevent any future discrimination.

Accordingly, it is hereby adjudged, ordered, and decreed that:

1. Defendants, their successors, and all individuals acting in concert with them are enjoined from using the entry-level admission examination and the promotion-level sergeant examination which have been found discriminatory in this action in the manner in which such examinations have been used in the past.

2. Defendants, their successors, and all individuals acting in concert with them (a) with respect to the hiring of individuals for the entry-level position of patrolman, shall establish two lists of qualified candidates—a minority list composed of qualified blacks, Latinos, and Asians and a non-minority list composed of all others found qualified; and (b) with respect to the promotion of individuals within the police department to the position of sergeant, shall establish two lists of qualified candidates—a minority list composed of qualified blacks, Latinos, and Asians and a non-minority list composed of all others qualified.

3. Defendants, their successors, and all individuals acting in concert with them (a) with respect to the appointment of individuals to the entry-level position of patrolman, shall select and appoint three qualified individuals from the minority list established under Section 2(a), supra, for every two qualified individuals selected and appointed from the non-minority list established under Section 2(a), supra, until the total number of minority policemen within the police department equals, at a minimum, 30 per cent of the total number of policemen within the department; and (b) with respect to the appointment of individuals to the position of sergeant, select and appoint one qualified individual from the minority list established under Section 2(b), supra, for every qualified individual selected and appointed from the non-minority list established under Section 2(b), supra, until the total number of minority sergeants within the police department equals, at a minimum, 30 per cent of the total number of sergeants within the department.

4. Criteria for defining the terms "minority" and "non-minority" for the purpose of constructing appointment lists as described in Section 2, *supra,* shall be submitted to the court for review and approval before being used.

5. In order to insure that only qualified individuals are appointed to either the position of patrolman or the position of sergeant, all examination and selection procedures to be used for determining the qualification of candidates for the appointment lists described in Section 2 *supra,* shall be submitted to the court for review and approval before appointments are made.

6. Exemptions from state and local restrictions will be granted if necessary to effectuate this decision.

So ordered.